# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE SWERVEPAY ACQUISITION, LLC | ) ) | Consolidated C.A. No. 2021-0447-KSJM |

## POST-TRIAL OPINION ADDRESSING LIABILITY AND DAMAGES

Date Submitted: July 10, 2025
Date Decided: July 31, 2026

Peter J. Walsh, Jr., Nicholas D. Mozal, Ryan M. Crowley, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Orion Armon, COOLEY LLP, Denver, Colorado; Luke Cadigan, Timothy Cook, COOLEY LLP, Boston, Massachusetts; Caroline Pignatelli, Alessandra Rafalson, Katelyn Kang, COOLEY LLP, New York, New York; Matthew Martinez, COOLEY LLP, San Diego, California; Bradley Levison, Carrie A. Herschman, HERSCHMAN LEVISON PLLC, Chicago, Illinois; *Counsel for SPOSC Investment Holdings, LLC, Jaeme Adams, Katrina Adams, and Christopher Hamilton*.

A. Thompson Bayliss, Caleb Theriot, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Jay P. Lefkowitz, Dan Cellucci, Mary T. Reale, Amal El Bakhar, KIRKLAND & ELLIS LLP, New York, New York; Anna Rotman, KIRKLAND & ELLIS LLP, Houston, Texas; Jeremy Fielding, KIRKLAND & ELLIS LLP, Dallas, Texas; *Counsel for OSC Investment, L.P., OSC Investment GP, LLC, New Mountain Capital, LLC, New Mountain Partners V, L.P., New Mountain Investments V, LLC, BSIP OS, LLC, Eir Partners LLC, and Robert Wechsler*.

**McCORMICK, C.**

This case arises from an acquisition of a payment processing software and services company, or "PayFac." The buyers paid cash and stock at close and agreed to make post-closing cash and stock earnout payments contingent on the PayFac achieving financial milestones. For a PayFac's services, merchants pay the PayFac a percentage of all payments facilitated by the PayFac, or a slice of the overall pie. Payments volume represents the overall pie and is thus a key financial metric for PayFacs. The sellers therefore pressed for information on the buyers' payments volume before agreeing to the deal. The parties also structured the consideration and revenue-based earnout targets on the buyers' representations concerning payments volume.

Ultimately, the buyers did not have the payments volume they represented to the sellers, the acquired company did not hit the revenue targets, and the sellers never received the earnout payments. Through this lawsuit, the sellers claim that the buyers fraudulently induced them into the acquisition by misrepresenting their payments volume. This post-trial decision enters judgment for the sellers, awarding damages in the amount of the earnouts that they would have received had the misrepresented payments volume been true, as well as the increased value of their rollover units.

## I. FACTUAL BACKGROUND

Trial took place over five days. The record comprises 2,267 trial exhibits, live testimony from twelve fact and three expert witnesses, deposition testimony from

three fact witnesses, and 81 stipulations of fact. These are the facts as the court finds them after trial.[1]

### A. New Mountain Diligences Ontario's Payments Volume Before Acquiring Ontario.

Ontario Systems, LLC ("Ontario") sells software that helps its customers manage their revenue cycle workflow, including accounts receivable.[2] In August

---

[1] This decision refers to OSC Investment, L.P.; OSC Investment GP, LLC; New Mountain Capital, LLC; New Mountain Partners V, L.P.; New Mountain Investments V, LLC; BSIP OS, LLC; Eir Partners LLC; and Robert Wechsler collectively as "Buyers" and to SPOSC Investment Holdings, LLC; Jaeme Adams; Katrina Adams; and Christopher Hamilton collectively as "Sellers." This decision cites to: C.A. No. 2021-0447-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX-" number); the parties' demonstratives, Dkts. 624, 625 (by "PDX-" number for Sellers and by "DDX-" number for Buyers); the trial transcript, Dkts. 611–14, 626 ("Trial Tr."); and stipulated facts in Section II of the Parties' Stipulation and Pre-Trial Order, Dkt. 584 ("PTO"). The parties called the following fact witnesses: Jaeme Adams (SwervePay CEO); Katrina Adams (SwervePay Director of Operations); Brett Carlson (Eir Partners CEO); Alberto "Joe" Delgado (New Mountain Managing Director); Matthew Dubbioso (New Mountain Managing Director); John Durrett (Blue Star Partner); Christopher Hamilton (SwervePay Chief Technical Officer); Daniel Malven (4490 Ventures Partner); Tim O'Brien (Ontario CEO); Michael Oshinsky (New Mountain Vice President); Robert Wechsler (Blue Star President); and Jennifer Zaja (SwervePay Director of Administration). The parties called the following expert witnesses: Yvette Austin (Buyers' damages expert); Murray Beach (Sellers' damages expert); Anthony Hayes (Buyers' payments expert). The parties lodged the deposition transcripts of the witnesses who appeared at trial and called the following witnesses by deposition only: David Franklin (Ontario COO) (by video); Jennifer Richmond (Worldpay Compliance Manager) (by video); and Malcolm Thorne (4490 Ventures Partner) (by video). The deposition transcripts are cited by using the witnesses' last names and "Dep. Tr."

[2] PTO ¶ 79. Ontario is now named "Finvi." *Id.* ¶ 83.

2019, private equity firm New Mountain Capital ("New Mountain") acquired Ontario.[3] Eir Partners LLC partnered with New Mountain for the acquisition.[4]

New Mountain believed that Ontario could increase its revenue by acquiring a PayFac and selling PayFac services as an add-on to its existing software.[5] For payment processing software and services provided by PayFacs, merchants pay a percentage of all payments facilitated by the PayFac.[6] This fee is called the "merchant discount rate."[7] From that fee, the PayFac passes through payment of: (i) an interchange fee; (ii) a network fee; and (iii) a processor fee (also called the "buy rate"). The portion of the merchant's payment that the PayFac retains is called the PayFac's "take rate." The percentage of the interchange fee, network fee, and buy rate—and thus also the take rate—varies depending on the transaction and the PayFac's pricing approach.[8] But it suffices to say that overall payments volume is a key financial metric for PayFacs.[9]

To test their investment thesis, New Mountain conducted due diligence on Ontario's payments volume during the summer of 2019. During that process, New Mountain received a description of Ontario's payments volume from Ontario's

---

[3] *Id.* "A [New Mountain] fund acquired an indirect interest in Ontario by purchasing units in OSC Investment, L.P., which indirectly wholly owned Ontario." *Id.*

[4] *Id.* ¶ 82.

[5] *See* JX-290 at 4.

[6] PTO ¶ 56.

[7] JX-1819 ("Hayes Rebuttal Report") ¶ 81.

[8] *Id.* ¶ 92.

[9] Trial Tr. at 16:5–10 (J. Adams).

3

investment banker, Robert W. Baird & Co. Baird stated that Ontario touched nearly $170 billion in payments volume, about $34 billion of which came from consumer payments.[10]

New Mountain first received this description through an internal presentation circulated in early July.[11] The presentation included a slide showing a preliminary breakdown of Ontario's "Payments Monetization Opportunity."[12] The slide included a $34 billion figure listed as "Patient Payments that Ontario Facilitates (Direct Contact)."[13] This slide combined this figure with $48 million of patient payments "Outside of Ontario Direct Contact" and $88 billion of insurance payments to create a $170 billion figure representing "Total Payments on Ontario Platform."[14] The slide did not identify these figures as estimates. The only figure on the slide that was listed as an "estimate" was $195.8 million of "Estimated Healthcare payments made via Ontario solution today based on $2.4M Ontario revenue for 2019E."[15]

The New Mountain and Eir Partners teams wanted to understand the source of these figures. On July 9, Eir Partners CEO Brett Carlson reached out to Baird to ask for "payment volume data on the [healthcare] side that is more than a swag [that is, a scientific, wild-*ss guess][.]"[16] Carlson also emailed the New Mountain team

---

[10] JX-57 at 207–08; JX-209 at 1–2; *see also* Trial Tr. at 1383:3–6 (Carlson).

[11] JX-201.

[12] *Id.* at 10.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] JX-208 at 1.

4

that he estimated that Ontario "has $60BN+ of self pay ($34BN) and balances after billing (check me here but I think ~$30BN) and have the right clients."[17]  He stated that there was "$1.25BN of total patient payments" running through Ontario's system.[18]  All told, he felt "it is safe to assume that Ontario will be involved in $80 - $100BN+ of consumer payment transactions during our investment period."[19]

In response to Carlson's request for statistical backup on healthcare figures,[20] the Baird team provided the following support:

> Ontario has quantified the payments flowing through the system as $33.9 billion in consumer payments, $87.4 billion in third party payer payments and another $48.4 billion in healthcare payments that Ontario documents and tracks but would not service (i.e. Ontario has insight into what triggered the payment and where it came from, which is direct to the provider from a consumer or third party).[21]

The Baird team explained its assumptions as follows:

> **Consumer Payments**
>
> 1) 7,000 provider agents performing self-pay (half the licensed seats) securing 3 payments per hour for 8 hours per day for 260 working days with average payment size of $175 = $7.64B
>
> 2) 100,116 [debt collection] Agents securing 10 payments per day for 260 days = 260,301,600 payments with an average payment size of $100 = $26.03 billion in payments
>
> 3) Related to court systems payments Ontario receives an average of 2,015 payments per day with an average size of

---

[17] JX-209 at 3.

[18] *Id.*

[19] *Id.*

[20] *See* JX-206.

[21] JX-208 at 1.

5

$420 for a total per day of $855,244. Assuming the standard 260 days translates to $222.0 million annually. Note the portal operates 365 days per year but most Sunday and Holidays are light so we are using our standard of 260 days.

**Third Party Payer Payments**

4) 7,000 provider agents securing 6 claims per hour for 8 hours a day for 260 working days with an average payment size of $1,000 = $87.4 billion in Payments[.][22]

Baird based its assumptions on data it received from Ontario's co-founder, Ronald Fauquher.[23] Fauquher did not base his numbers on the volume of payments actually flowing through Ontario. Rather, he based his numbers on industry-wide benchmarks from a report created by the Association of Credit and Collection Professionals ("ACA").[24] Fauquher described the figures as "averages of averages."[25] This description, however, did not appear in Baird's reply to Carlson.[26] Rather, Baird's analysis suggested that there were $34 billion of consumer payments "flowing through" Ontario's systems that Ontario had yet to monetize.[27]

Carlson did not read the analysis as providing "averages of averages." Rather, after he received Baird's reply, Carlson updated New Mountain's Managing Director

---

[22] *Id.* (emphasis in original).

[23] *See* JX-492 at 1; *compare* JX-206 *with* JX-492; *see also* Trial Tr. at 998:13–1000:1 (Durrett).

[24] JX-499 at 1–2.

[25] JX-492 at 3.

[26] JX-208 at 1.

[27] *Id.*

Matthew Holt, John Woody, the CEO of BKO Capital, LLC,[28] and the New Mountain team over email. He stated that the "$33.9BN" of consumer "payments flowing through [Ontario's] system" number provided by Baird represented "what is addressable today with Ontario's current product."[29] Carlson believed it would "grow in excess of 10% per year based on their clients and consumer tailwinds."[30]

Carlson further stated that, at the time, Ontario participated in a revenue share on $1.25 billion of total patient payments.[31] This representation made New Mountain Vice President Michael Oshinsky skeptical of the "$33.9BN" figure.[32] Oshinsky suggested contacting Baird to "get an understanding of what is in the $33.9B of consumer payments" figure, compared to the $1.25 billion of estimated currently monetized payments.[33] He stated that "[c]learly if you believe any of this the deal is a no brainer," but he noted that he was "skeptical" that another private equity firm would leave this type of opportunity on the table.[34] Over the next several days, New Mountain and Eir Partners had calls with Baird to understand the assumptions behind the $34 billion number.[35]

---

[28] BKO Capital is a non-party and limited partner in OSC Investment, L.P. PTO ¶ 74.

[29] JX-209 at 1–2.

[30] *Id.*

[31] *Id.* at 3.

[32] *Id.* at 1.

[33] *Id.*

[34] *Id.*

[35] JX-214 at 1; Trial Tr. at 845:1–10 (Oshinsky).

New Mountain and Ontario also respectively engaged consulting firms McKinsey & Company and L.E.K. Consulting to estimate Ontario's total addressable market ("TAM").[36] To that end, McKinsey produced a "Market Sizing" slide estimating that the market for processing credit card, debit card, and electronic transfer payments could be as large as $57 billion.[37] L.E.K. estimated that, of $235 billion of annual payments made by U.S. healthcare providers, electronic payment is utilized for 65%, creating a TAM for healthcare payments of approximately $150 billion.[38] For debt collection, L.E.K. also estimated a TAM of roughly $150 billion.[39] These analyses were market estimates; neither McKinsey's nor L.E.K.'s analysis investigated or analyzed the volume of payments flowing through Ontario's system.[40]

On July 26, 2019, New Mountain's deal team circulated its final post-diligence slide deck.[41] In the slides explaining the investment thesis, the team described Ontario as "a stable platform occupying valuable real estate with high barriers to entry."[42] The slide stated that the platform "[p]rocesses $170B+ payments ($34B patient payments) and tracks $1T+ receivables along with 1B+ consumer

---

[36] Trial Tr. at 845:11–17 (Oshinsky).

[37] JX-230 at 67 (summing credit card, debit card, and "ACH / EFT" payment markets).

[38] JX-145 at 139.

[39] *Id.*; Dubbioso Dep. Tr. at 85:3–25.

[40] *See* Dubbioso Dep. Tr. at 85:22–25 (describing L.E.K.'s TAM estimate as a "payments volume[] for an entire market of [debt collection] customers, inclusive of those that Ontario serves and those that it does not").

[41] JX-243.

[42] *Id.* at 8.

8

interactions."[43]  In a slide on the "5-Year Vision for Ontario," the team stated there was "$1.25B of payments volume currently processed – mostly from [collection agencies] – at below market economics" and that by 2024 Ontario would have a "[s]ubstantial foothold in healthcare payments with large and growing portion of $34B in captive payments processed through Ontario's workflow."[44]

In August 2019, New Mountain and Eir Partners acquired Ontario at an enterprise valuation of $425 million.[45]  A New Mountain fund, New Mountain Partners V, L.P. ("Fund V LP"), paid $300 million for a 98% stake in Ontario's holding entity OSC Investment, L.P.[46]  In its letter announcing the deal to investors, New Mountain stated that "Ontario touches $170 billion of healthcare payments annually, of which $34 billion are consumer paid."[47]

## B. Blue Star Invests In Ontario.

BSIP OS LLC ("Blue Star") is a "private equity firm that invests in software and payments businesses."[48]  After acquiring Ontario, New Mountain recruited Blue Star and its founder and managing director Robert Wechsler to help advise on payments issues and analyze the payments opportunity.[49]

---

[43] *Id.*

[44] *Id.* at 10.

[45] *See* JX-290 at 3.

[46] *Id.*; PTO ¶ 83.

[47] JX-290 at 6.

[48] Trial Tr. at 920:8–10 (Durrett).

[49] *Id.* at 815:18–21 (Oshinsky); *id.* at 923:16–20 (Durrett); PTO ¶ 69.

9

Before Blue Star invested, Wechsler asked "[h]ow much volume is there to monetize" on Ontario's platform.[50] In fact, he asked multiple questions designed to get a better understanding of the $34 billion figure.[51] In response, Oshinsky provided Wechsler with information from BillingTree, Ontario's then-largest payment-processing partner.[52] Oshinsky described the "Billing Tree report" as "our best granular info" on individual customer payment accounts.[53]

Wechsler forwarded that email to John Durrett, his payments analyst.[54] Based on their experience, they assumed only two-thirds of the $34 billion would be credit/debit available for conversion, of which Ontario could control only half.[55] Wechsler presented New Mountain with this payments opportunity analysis, ultimately concluding that Ontario may be able to monetize $12.5 billion of the purported $34 billion payments volume.[56]

In October 2019, Blue Star invested $5 million in Ontario under the assumption that Ontario would acquire payments technology.[57] Wechsler took a seat on Ontario's board,[58] and he was granted options that vested when New Mountain

---

[50] JX-292 at 2.

[51] *Id.*; Trial Tr. at 1126:6–24, 1135:6–20 (Wechsler).

[52] JX-1843 at 3.

[53] *Id.*; *see also* Trial Tr. at 1036:8–18 (Wechsler) (testifying that BillingTree data "was the best we had").

[54] JX-1843 at 2.

[55] Trial Tr. at 1128:16–1129:6 (Wechsler); JX-1843 at 2.

[56] JX-1842 at 1.

[57] Trial Tr. at 1129:11–15, 1130:17–20 (Wechsler).

[58] *Id.* at 1129:11–15, 1130:13–16 (Wechsler).

10

achieved a set return multiple upon a change of control.[59]  Blue Star also received

$100,000 a month to consult on the investment.[60]  Wechsler, Blue Star contractor

Matthew Steffe, and Durrett then began assessing PayFac acquisition opportunities

with New Mountain's Matthew Dubbioso and Oshinsky.[61]

## C.     Ontario Offers To Acquire SwervePay.

SwervePay[62] was an Illinois-based PayFac founded by spouses Jaeme and

Katrina Adams in 2010.[63]  Jaeme, Katrina, and Christopher Hamilton (collectively,

the "Individual Sellers") all held executive roles with SwervePay.[64]  Jaeme served as

SwervePay's CEO.[65]  Katrina served as SwervePay's Director of Operations.[66]  And

Hamilton joined SwervePay in 2013 as Chief Technology Officer and wrote most of

SwervePay's software.[67]

---

[59] JX-1917 at 27.

[60] Trial Tr. at 1129:23–1130:2 (Wechsler).

[61] PTO ¶ 84; *see, e.g.*, JX-1852 at 2.

[62] Before the SwervePay acquisition, SwervePay, LLC ("Legacy SwervePay") owned the SwervePay business.  PTO ¶¶ 55–56.  Legacy SwervePay changed its name to SPOSC Investment Holdings, LLC on February 26, 2020.  *Id.* ¶ 55.  An entity called SwervePay Acquisition, LLC ("New SwervePay") then acquired the business from Legacy SwervePay.  *Id.* ¶ 81.  New SwervePay changed its name from SwervePay Acquisition, LLC to SwervePay, LLC on April 8, 2020.  *Id.*  For simplicity, this decision refers to the business and its operations generally as "SwervePay."

[63] *Id.* ¶¶ 56–57, 59; Trial Tr. at 6:13–14 (J. Adams).  This decision refers to Jaeme and Katrina Adams by their first names.  The court intends no familiarity or disrespect.

[64] PTO ¶¶ 57–59.

[65] *Id.* ¶ 57.

[66] *Id.* ¶ 59.

[67] *Id.* ¶ 58; Trial Tr. at 12:1–5 (J. Adams).

Ontario and SwervePay had a business relationship before Buyers acquired SwervePay. SwervePay had partnered with Ontario beginning in May 2019 to integrate its payment application into Ontario's software.[68] And New Mountain began discussions with SwervePay about combining with Ontario before New Mountain acquired Ontario.[69]

Carlson first reached out to Jaeme in the summer of 2019. Although Carlson had "not look[ed] at Ontario-specific data at this time,"[70] he told Jaeme that Ontario had an "unbelievable" amount of payments volume to monetize, and asked whether Jaeme was interested in discussing a partnership.[71] Jaeme later had a call with Carlson and Ontario's then-president Jason Harrington to discuss the idea.[72] In July 2019, Harrington and Jaeme discussed Ontario's platform and the payments volume available for monetization.[73] During those conversations, Harrington represented there was "$170 billion of payments volume running through [Ontario's] system."[74]

By early October 2019, the New Mountain/Eir Partners/Blue Star team was focused on either acquiring one of their PayFac partners with "a scalable book of business" or acquiring a "small and under-marketed" PayFac that they could develop

---

[68] Trial Tr. at 21:22–22:4 (J. Adams).

[69] *Id.* at 25:6–22 (J. Adams); *id.* at 1381:14–17 (Carlson); JX-156.

[70] Trial Tr. at 1383:7–12 (Carlson).

[71] JX-179; *see also* Trial Tr. at 25:6–17 (J. Adams); *id.* at 1382:20–23 (Carlson).

[72] Trial Tr. at 25:20–26:6 (J. Adams).

[73] *Id.* at 22:9–23:7 (J. Adams).

[74] *Id.* at 23:3–7 (J. Adams).

on a reasonable timeline.[75]  To explore whether SwervePay was the right target, Jaeme, Carlson, and Steffe met in Las Vegas on October 29, 2019.[76]

SwervePay and Blue Star had a business relationship before Blue Star invested in Ontario.  In March 2019, a mutual acquaintance had connected Jaeme to Wechsler and Steffe through email.[77]  The acquaintance described Wechsler as someone who had been in Jaeme's shoes, because he had also "built, ran and sold numerous payments & software companies to strategics and multiple private equity firms."[78]  The acquaintance advised that Wechsler and Steffe were now "investing their personal capital" through Blue Star and that Jaeme should view them as people "you could lean on for advice, if you ever chose to do anything."[79]

Over the ensuing months, Wechsler and Jaeme began discussing a potential investment by Blue Star in SwervePay.  SwervePay even invited Wechsler to join its board of directors.[80]  And Jaeme told Wechsler that SwervePay closed a partnership with Ontario, which he stated had "170 billion running through them for healthcare, utilities and municipalities and have not monetized it."[81]  Wechsler declined the invitation to join SwervePay's board, reassured Jaeme that he would "always be just

---

[75] JX-1844 at 4.

[76] PTO ¶ 86.

[77] JX-129 at 3.

[78] *Id.*

[79] *Id.*

[80] PTO ¶ 85; Trial Tr. at 30:17–19, 32:24–33:10 (J. Adams); *id.* at 1115:10–14 (Wechsler).

[81] JX-213 at 3.

a phone call away - whatever you need," and then finalized Blue Star's $5 million investment in Ontario two months later.[82]

Jaeme learned about Wechsler's move to Ontario just before the October 29, 2019 meeting. Carlson emailed Jaeme early on October 29 that Ontario had brought Wechsler on as an investor and board member and that he "mentioned you guys know each other well."[83] This was the first Jaeme heard of Wechsler's investment relationship with Ontario.[84] Jaeme was frustrated to learn that Wechsler joined Ontario's board after Jaeme alerted him to their relationship with Ontario.[85]

Jaeme wanted to understand Wechsler's role in the negotiation dynamics, and Wechsler was intentionally vague on that topic for much of the negotiations. Jaeme asked how Blue Star's Ontario investment would change his relationship with Wechsler, who had previously presented himself as an ally and sounding board.[86] Wechsler responded stating that he still wanted to do a deal with SwervePay.[87] Jaeme asked Wechsler to confirm that the "deal" he was referring to was between SwervePay and New Mountain, not SwervePay and Ontario.[88] Wechsler replied that "it could be either or both."[89]

---

[82] JX-2191.

[83] JX-332 at 2.

[84] Trial Tr. at 34:4–19 (J. Adams).

[85] *Id.* at 34:20–24, 37:5–11 (J. Adams).

[86] *Id.* at 35:10–21, 37:7–13 (J. Adams); JX-1845 at 1.

[87] JX-1845 at 2.

[88] *Id.*

[89] *Id.*

14

After the meeting, Carlson told Jaeme that he "love[d] the dynamic" between the parties and that they could "work on an attractive business combination between all of us as partners."[90] Carlson reported to New Mountain that he wanted to keep the deal "tight for the time being" because "Jaeme is more comfortable with people he know[s] - gets guarded otherwise."[91] Carlson noted that another company was pursuing SwervePay and that he "[m]ight invite Jaeme to New Mountain at the right time."[92]

After the meeting, Jaeme sent a joint-venture proposal to Wechsler.[93] New Mountain and Eir Partners favored an acquisition and rejected the proposal.[94] As they discussed putting together a deal on November 23, 2019, Wechsler texted Carlson that Blue Star was "close to [Jaeme] and he trusts us."[95] He advised them to be "aggressive but not binary."[96]

On November 28, New Mountain and Eir Partners sent over a letter of intent on behalf of Ontario.[97] Under its proposed terms, SwervePay would receive $17.5 million up front and up to $32.5 million across two earnouts.[98] Ontario would retain

---

[90] JX-1969 at 2.

[91] *Id.* at 1.

[92] *Id.*

[93] Trial Tr. at 37:14–38:21 (J. Adams); JX-347.

[94] *See* Trial Tr. at 39:13–40:23 (J. Adams).

[95] JX-398 at 1.

[96] *Id.*

[97] JX-1849 at 2.

[98] *Id.*

SwervePay's team to lead the post-acquisition company and would work with Jaeme to "develop post-closing employment and compensation plans."[99] In the cover email, Steffe indicated that they wished to start diligence immediately.[100] Jaeme responded by setting up a call with Carlson to discuss the terms.[101] The following morning, Jaeme called Wechsler to discuss the earnout terms before speaking with Carlson.[102] As Jaeme negotiated the earnout over the phone with Carlson, Wechsler "was on the other line," in Wechsler's words, "playing the 'friend' insider."[103]

SwervePay rejected the initial offer.[104] New Mountain sent a revised letter of intent on December 2, 2019. The revised letter upped the valuation from $50 million to $75 million and provided for $55 million in payments across two earnouts.[105] When Jaeme shared the revised letter, he said that Wechsler advised him that if they did not make a deal, New Mountain would look to quickly acquire another payments business.[106] SwervePay's board rejected the deal and countered with an all-equity proposal so that they could benefit from the monetization upside.[107] As 4490

---

[99] *Id.*

[100] *Id.* at 1 (proposing to "kick off diligence next week, if possible").

[101] JX-416 at 2.

[102] *Id.* at 1.

[103] *Id.*

[104] JX-422 at 1.

[105] *Id.* at 2.

[106] *Id.* at 1.

[107] Trial Tr. at 40:24–41:8 (J. Adams); *id.* at 457:19–458:2 (Malven).

16

Ventures[108] partner Daniel Malven testified, "our understanding was that there was [$]40 to $50 billion of unmonetized payment volume being controlled by Ontario software. If we were able to monetize that, that would create a tremendous amount of equity value. So we wanted to ride that equity value up."[109]

On December 5, New Mountain and Eir Partners responded with an updated letter of intent.[110] This proposal valued SwervePay at $75 million, provided a $20 million upfront payment in a mix of cash and equity, and provided an additional $55 million across two earnouts.[111] SwervePay accepted and the parties executed the letter of intent.[112]

### D.    Durrett Analyzes Ontario's Payments Opportunity.

After Ontario and SwervePay executed the letter of intent, Blue Star continued to explore Ontario's payments opportunity and tasked Durrett with identifying new payments revenue drivers for the go-to-market strategy.[113] In November 2019, Durrett reached out to Ontario's CEO because he was "particularly interested in mapping out how much volume is being processed outside our systems and how we might get control of it."[114]

---

[108] 4490 Ventures owned equity in Legacy SwervePay. PTO ¶ 70.

[109] Trial Tr. at 457:21–458:2 (Malven).

[110] JX-453 at 2.

[111] *Id.*

[112] *Id.* at 1.

[113] *See, e.g.*, JX-2182; Trial Tr. at 924:7–15, 951:13–20 (Durrett); *id.* at 1110:2–11 (Wechsler).

[114] JX-374 at 1.

Durrett stated that he felt that there was "a big opportunity" but it was "going to take some work to piece it all together."[115]  He started by exercising New Mountain's and Blue Star's contractual audit rights to obtain data from Ontario's four most prominent processing partners.[116]  Throughout November and December 2019, Blue Star and New Mountain struggled to get the necessary data, and Carlson commented that these issues made him "want to buy SwervePay ASAP."[117]

Durrett also looped in an Ontario executive and co-founder, Steve Blount, asking for back-up data to help validate the $34 billion volume figure.[118]  On December 12, Blount responded that there was not an automated way to get Ontario-specific customer data from its software and that Ontario reached the $34 billion figure using averages from the ACA report.[119]  Blount explained to Durrett the "averages of averages" problem—that the $34 billion figure was all "assumption based," pulled together from various benchmarks and statistics based on averages, and that there was no longitudinal study over time.[120]

 Durrett then performed a "bottoms-up" analysis of Ontario's payments volume, using real customer data to try and accurately size the payments opportunity flowing through Ontario's system.[121]  Durrett took a month's worth of data from

---

[115] *Id.*

[116] JX-505 at 5–6.

[117] *Id.* at 1.

[118] JX-1851.

[119] JX-499 at 1–2.

[120] *Id.*

[121] Trial Tr. at 933:3–21, 938:4–939:22 (Durrett).

Ontario's four primary payments vendors and built up an estimate of the payments volume.[122] Durrett arrived at a figure of just over $5.2 billion.[123] Of this volume, he estimated that there was about $3.3 billion worth of monetizable payments volume flowing through Ontario's systems.[124]

On December 17, 2019, when Durrett circulated his analysis internally, he warned that it was limited because it was based on the data that Ontario's vendors shared.[125] He told the team that he would treat the estimate "as another example of how the data they're sharing doesn't seem to jibe with what we'd expect, and make them explain it."[126]

On December 23, Oshinsky noted that based on the data, "[w]e are showing a much lower rev per seat than industry standards" and that they needed to figure out why.[127] He speculated that one vendor was "'hiding' nearly $5m from us" and questioned the $5.2 billion figure.[128] On January 16, Oshinsky updated the team that "we are very light on details of the actual payments buildup" and were working on additional valuation frameworks that relied on consolidated financials provided by

---

[122] JX-638 at 1.

[123] JX-666 at 6 ("Summary Analysis" tab, Row 26, Column F); Trial Tr. at 1001:16–18 (Durrett).

[124] Trial Tr. at 1001:6–13 (Durrett).

[125] JX-544 at 1.

[126] *Id.*

[127] *Id.*

[128] *Id.*

vendors.[129]  Nevertheless, by January 2020, New Mountain internally worked under the assumption that Ontario touched approximately $5 billion in payments.[130]  And New Mountain began to use the $5 billion estimate when comparing Ontario to other potential acquisition targets.[131]

### E. SwervePay Diligences Ontario's Payments Volume.

Blue Star, New Mountain, and SwervePay had begun diligence by early December 2019.[132]  Between December 9 and December 23, the parties held at least three diligence calls.[133]  At the December 9 kick-off call, representatives from Blue Star and New Mountain stated to Jaeme and Hamilton that Ontario had between $40 and $50 billion of processing volume "captive to the platform."[134]  On December 27, SwervePay sent over its first set of diligence requests.[135]

---

[129] JX-586 at 1.

[130] *See, e.g.*, *id.* (referring to "Ontario's ~$5.5B in current volume"); JX-603 at 1 ("With Ontario, . . . $5B overall sitting there."); JX-734 at 1 (describing New Mountain's "low-end estimate" of Ontario's "annual volume potential" available for conversion as $5.5 billion), *but see* Trial Tr. at 970:21–971:13 (Durrett) (noting that he meant to write $5.2 billion rather than $5.5 billion)).  Buyers used several figures around $5 billion when referring to Durrett's analysis.  This decision thus uses the figures $5 billion, $5.2 billion, and $5.5 billion interchangeably depending on the context.  But each figure is based on Durrett's analysis.

[131] *See* JX-586 at 1; JX-603 at 1.

[132] JX-470 at 1.

[133] *Id.*; PTO ¶¶ 88, 90.

[134] Trial Tr. at 314:13–315:3 (Hamilton); *see also id.* at 43:21–44:7 (J. Adams).

[135] JX-556.

On January 25, 2020, New Mountain's Oshinsky sent New Mountain's projected financials and model for Ontario to Jaeme.[136] The materials included a slide deck containing New Mountain's initial investment thesis, which stated that Ontario processed over $170 billion of payments.[137]

SwervePay requested an in-person diligence meeting, which the parties set for January 31. Leading up to the meeting, Oshinsky advised Wechsler, Woody, Blount and Ontario's then-CTO Michael Wolfe by email that

> Jaeme was pretty direct with his goal for the meeting. From their side, they want to understand how Ontario is going to be able to move payments volume technically, commercially and contractually on the platform. . . . His goal is 'to be able to go back to his Board and confidently say they can hit the earnouts.'[138]

Durrett responded with a proposed "agenda/script to convince Swerve they can hit their earnout."[139] He suggested the team lead with the technical part "no matter what" and have the contractual and commercial parts "in our back pocket."[140] On those subjects, he noted that "[w]e've identified at least $5.5 B in payments volume" and that "we only have to get 80% of volume moved to hit [the earnout] target - and we intend to get >90% of the volume [because] . . . we can move ALL of it."[141] Wechsler

---

[136] JX-609 at 1.

[137] *Id.* at 8.

[138] JX-620 at 2.

[139] *Id.* at 1.

[140] *Id.*

[141] *Id.* at 2.

felt that they did not need to be "selling" because they had SwervePay "where they need to be."[142]

On January 31, Jaeme, Hamilton, Durrett, Oshinsky and others met at the Chicago O'Hare Hilton.[143] At the meeting, New Mountain and Blue Star continued to represent that there was between $40 and $50 billion worth of payments volume running through Ontario's platform.[144] This was so although they had received Durrett's bottoms-up analysis and had been discussing it internally.

After the meeting, Durrett observed that SwervePay "believes in the opportunity and wants to get it done" and identified a few "problems we need to solve to get max payments penetration."[145] He described getting SwervePay customers to a place where they would adopt the Ontario payments solution as a top priority.[146] He estimated that about a third of existing customers would make the switch, another third would move happily if Ontario added some new features, and the last third might require some "cajoling."[147] He raised the possibility of forced conversion without discussing what that would involve, but he concluded that "a lot of the base can be moved voluntarily and happily with the right carrots."[148]

---

[142] JX-619 at 1.

[143] PTO ¶ 92.

[144] Trial Tr. at 317:24–318:7 (Hamilton).

[145] JX-630 at 1.

[146] *Id.*

[147] *Id.*

[148] *Id.*

22

On February 4, Jaeme sent Oshinsky follow up questions about Ontario's processing volume.[149] He asked for "a summary of all monthly payment processing volume separated by processing platform" and noted that the "[i]mportant data points we are interested in include successful transaction volume and transaction count (and/or average ticket size)."[150]

Oshinsky forwarded the email to Blount, asking who could answer the questions.[151] Blount responded with Durrett's analysis, noting that they "had pulled together a month's worth of data from our 4 primary payments vendors" and Durrett "then built out the estimated Ontario Payments opportunity sizing" attached.[152] He advised that "[w]e might want to speak with [] Durrett about how best to present this to Jaeme and Chris [Hamilton] at SwervePay."[153]

On February 6, Oshinsky looped in Durrett, asking whether sending anonymized data reflecting October's processing volume was "an appropriate response."[154] Although Blount considered it appropriate, Durrett asked if there was "[a]ny reason not to just provide the Summary Analysis tab [from his analysis], so [Jaeme] doesn't have to do all the XLS work to get to that same point?"[155] He noted

[149] JX-655 at 2–3.

[150] *Id.* at 3.

[151] JX-642 at 3–4.

[152] *Id.* at 3.

[153] *Id.*

[154] *Id.* at 2.

[155] *Id.* at 1.

that "at least that way he sees the volume is real and based on defensible assumptions."[156]

Oshinsky initially agreed with Durrett's approach.[157] But he later changed his mind.

That evening, Oshinsky pitched a new strategy to Blount and Durrett.[158] He said that he "want[ed] to lead [SwervePay] to make their own assumptions" because "[t]hey might wind up with an expected payments volume number way bigger than ours."[159] He reasoned that Buyers "can communicate that we think there's $5B of volume if they push back on the earnouts but *I'd like to keep that in our back pocket for now*."[160] He also "[w]ant[ed] to avoid the argument of whether 66% conversion of our payments volumes onto their platform is a reasonable earnout or not."[161] Durrett agreed, noting that "*[w]e can always come back with our #s if they don't conclude the right thing*."[162] Oshinsky assured the team that "[i]f they're low *we'll steer them up*."[163]

---

[156] *Id.*

[157] *Id.*

[158] JX-652 at 1.

[159] *Id.*

[160] *Id.* (emphasis added).

[161] *Id.*

[162] *Id.* (emphasis added).

[163] *Id.* (emphasis added). At trial, Oshinsky testified that he decided not to share Durrett's analysis with Sellers because he did not want to provide inaccurate information. Trial Tr. at 832:24–834:3 (Oshinsky). The contemporaneous evidence does not support this testimony.

The next day, Oshinsky responded to Jaeme with a revised version of the data from Durrett's analysis, noting that the data represented "only customers for which Ontario receives reporting."[164] Oshinsky stated that "[t]he total payment volume running through our workflow on a monthly basis is multiples of these numbers."[165]

After he received Oshinsky's email, Jaeme messaged Hamilton that Oshinsky sent over what he expected, but noted that they should have more volume data, which "is what we want to know."[166] He also wanted further detail on what Ontario made on the volume it broke out.[167] To Jaeme and Hamilton, if Ontario's platform was processing $40 to $50 billion, Ontario should have had data on those payments.[168] Hamilton commented that if Ontario did not have this information, "it's really hard to see how they came up with any of their volume numbers in the first place."[169]

The morning of February 7, Wechsler texted Jaeme that he had heard Jaeme was not yet comfortable.[170] He said, "I can't wait any longer. I told you the volume will get done and we have everything we need."[171] He stated that he had "too much time invested here and [had] to win. So if we aren't going to close - I need to proceed

---

[164] JX-655 at 2.

[165] *Id.*

[166] JX-658 at 1.

[167] *Id.* at 2–3.

[168] *Id.* at 1–2.

[169] *Id.* at 2–3.

[170] JX-662 at 1.

[171] *Id.*

25

elsewhere."[172] Jaeme asked Wechsler to push Oshinsky to respond to his questions in anticipation of a SwervePay board meeting the following Monday and asked if Wechsler would speak directly with some of the SwervePay board members.[173] Wechsler responded that he had "no problem" talking to anyone.[174]

Around 5:00 p.m. that evening, Oshinsky texted Jaeme to schedule a call for the following morning.[175] Oshinsky noted that "[w]e put together a good framework to estimate" the questions he raised in his email and offered that Durrett was "best positioned" to handle Jaeme's questions.[176]

Around 10:00 p.m., Jaeme emailed Oshinsky additional questions, asking him to further break down the data he previously provided.[177] In that February 7 email, Jaeme clarified what SwervePay sought to validate: "In conversations thus far, we've come to understand that ~$1B in payments have been monetized by Ontario and that there is an additional $40B-$50B that have not. *We're trying to get the clearest picture possible of where that volume exists by platform/segment and how that may or may not impact the ability for us to move it quickly to the PayFac*."[178] Jaeme asked for "processing volumes that *run through the Ontario platforms*" but that were not

---

[172] *Id.*

[173] *Id.* at 1–2.

[174] *Id.* at 2.

[175] JX-657 at 1.

[176] *Id.* at 2.

[177] JX-655 at 1.

[178] *Id.* (emphasis added).

26

presently monetized so that he could "identify the existing TAM *within the Ontario platform*" available for conversion.[179]

### F. The February 8 Email

Oshinsky raised Jaeme's latest round of questions with the broader team on February 8. Oshinsky cautioned that Jaeme was "oriented around a $40-50B payments volume number[.]"[180] Oshinsky expressed "concern[] that if we send [Durrett's analysis] without any context there might be a bad reaction."[181] Oshinsky asked his team for the basis of the $40 to $50 billion representation, noting that even the "most aggressive/high level analysis got to $34B."[182] Oshinsky questioned whether there was "any intellectually honest way to show the $34B in a build up."[183]

Although Steffe responded with the background to the $40 to $50 billion figure, Carlson advised the team not to "over work this."[184] Carlson instructed Oshinsky to "[s]how [Jaeme] a big oppty and tell him we need to get going," reasoning that "[h]e's also running out of cash pretty fast . . . and absolutely needs to do this deal."[185] Wechsler agreed, noting that "I spent time with [Jaeme] yesterday saying enough is enough."[186] Wechsler noted that Buyers could offer SwervePay some back-end

---

[179] *Id.* (emphasis added).

[180] JX-676 at 1.

[181] *Id.*

[182] *Id.*

[183] *Id.*

[184] JX-681 at 2.

[185] *Id.*

[186] *Id.*

27

minimum in the $5 to $10 million range as a solution, but felt that "we have to be firm and show him we are done chasing here."[187]

Dubbioso suggested that Wechsler or Steffe "catch Jaeme live today" and "signal the number is closer to $35B of volume opportunity and even a subset of that (i.e., 5-10B) makes a massive opportunity for him and his shareholders."[188] Dubbioso deferred to the others on strategy but stated that he wanted the team "to be responsive to his questions."[189]

Wechsler urged that a response to Jaeme's outstanding questions needed to come from Oshinsky.[190] Wechsler instructed Oshinsky to give Jaeme "a little 'deal fatigue' sense."[191]

Oshinsky said he would pass on the deal fatigue message and proposed "pointing to the $34B with appropriate caveats and saying 'this is it and we're done with reverse" due diligence.[192] Carlson agreed to the plan, saying "[p]oint to the $34BN but we are closing business, etc. You get it."[193] Oshinsky responded, "Roger. We're aligned[.]"[194]

---

[187] *Id.*

[188] *Id.*

[189] *Id.*

[190] *Id.* at 1.

[191] *Id.*

[192] *Id.*

[193] JX-673 at 1.

[194] *Id.*

Wechsler spoke to Jaeme by phone and reported by email to his team around noon on February 8.[195] He said: "Here is my recommendation. Extend the earnout period an additional 12 months to achieve. He will take that and we will close. We are not out anything."[196] Carlson and Wechsler responded expressing frustration with Jaeme holding up the deal, but Wechsler was confident they could "get[] it done" if they extended the earnout period.[197] Carlson questioned whether they should let Jaeme "push [them] around," given that Jaeme "b*tched so we gave him profit interests" and "now wants the earnout extended. Next thing he wants something else. His board is lucky we are at the table."[198] Wechsler maintained that he would rather "say sign or f*ck off. He and his board would cave."[199] Carlson offered to call Jaeme, while Dubbioso cautioned that they "can't lose the deal."[200]

Oshinsky also spoke to Jaeme the morning of February 8.[201] He reported back to his team around 4:00 p.m. that afternoon.[202] He advised that Jaeme "pushed hard on needing to understand/validate the opportunity. I do think it's a fair ask and I don't think he's going to settle for us just [to] point to a high level headline."[203]

---

[195] JX-674.

[196] *Id.* at 2.

[197] *Id.* at 1.

[198] *Id.*

[199] *Id.*

[200] *Id.*

[201] JX-669 at 1.

[202] *Id.*

[203] *Id.*

Oshinsky then cut and pasted the text of the $34 billion build-up that Ontario and its advisor had created during the July 2019 diligence.[204] Oshinsky asked whether it was "at all reasonable to send[.]"[205] He said he was "[o]pen to other ideas," and was "just trying to arrive at the best way to substantiate the big opportunity."[206]

Around the same time, Dubbioso texted Oshinsky that "now that [Wechsler] signed off on the $34B I think we do have some degree of CYA[.]"[207]

In an email exchange with Carlson that evening, Wechsler pushed for hardline tactics. He wanted to tell Jaeme the deal was called off, referring to the tactic as "deal judo" that "[a]lways works."[208]

Oshinsky emailed Jaeme a spreadsheet containing the $34 billion build-up just before midnight.[209] Oshinsky copied Dubbioso, Wechsler, Steffe, and Carlson on the email.[210] The email (the "February 8 Email") did not include any caveats.[211] It did not attach the Durrett analysis.[212] Nor did it identify the spreadsheet's source material or methodology.[213] The email noted that "there is significant additional

---

[204] *Id.*

[205] *Id.*

[206] *Id.*

[207] JX-122 at 1.

[208] JX-678 at 1.

[209] JX-685.

[210] *Id.*

[211] *See id.*

[212] *See id.*

[213] *See id.*

upside embedded from recent new key logos" and that there was "[o]bviously a massive embedded opportunity."[214] Of course, just hours earlier, Oshinsky stated on an internal New Mountain email thread that Ontario had "existing ~$5B of volumes."[215]

Wechsler followed up with the team the next morning, asking for reactions to his suggestion to extend the earnout.[216] Carlson was defensive of Jaeme, noting that "[h]e committed to the deal 100% over and over again. He really just wanted something to show his board . . . ."[217] Carlson did not think that they needed to extend the earnout period to get the deal done.

Dubbioso advised against extending the earnout because Jaeme "will just keep asking for more."[218] He felt the $34 billion volume build-out would satisfy Jaeme's request and asked whether Jaeme had the message that he should be moving toward closing on February 14.[219]

Wechsler responded: "What [Oshinsky] gave [Jaeme] is meaningless. This entire thing is a red herring."[220]

Like a red herring, the $34 billion representation was misleading. Throughout February 2020, Durrett continued his analysis of the payment opportunity and

---

[214] *Id.* at 1.

[215] JX-691 at 2.

[216] JX-689 at 1.

[217] JX-692 at 1.

[218] JX-689 at 1.

[219] *Id.*

[220] *Id.*

SwervePay's ability to reach an earnout. Around February 10, he told Blue Star executives that their assumptions were "aggressive," but he felt their targets were achievable by 2024.[221] In an email, Durrett referred to the $5.5 billion figure as their "low-end estimate [] of annual volume potential today," which was higher than the $3.5 billion New Mountain modeled internally.[222] Durrett felt that with SwervePay, Ontario could convert the majority of its payments volume and "*grow* to $40MM+ over [the] investment horizon."[223]

In a February 19 email to Blue Star executives, Durrett shared that he believed the payments opportunity at Ontario was "more likely in the $6B-10B range"—still far short of the $34 billion figure.[224] On February 23, Blount emailed Durrett's analysis to Ontario's new CEO Tim O'Brien to discuss Ontario's investment thesis.[225] The following afternoon—the day the SwervePay acquisition closed—Blount told O'Brien that "if asked," New Mountain and Wechsler would say $5.2 billion was "the total amount of payments being collected on [Ontario's] platform."[226]

---

[221] JX-719 at 1–2.

[222] JX-733 at 1.

[223] *Id.* (emphasis added).

[224] JX-797 at 1.

[225] JX-851 at 3.

[226] *Id.* at 1.

## G. SwervePay Approves The Acquisition.

Meanwhile, Wechsler continued to press for a deal with SwervePay, although he grew increasingly frustrated.[227] When Wechsler texted Jaeme on February 9, he offered to extend the earnout, which he described as a "huge give."[228]

That afternoon, Wechsler continued to push internally for extending the earnout, arguing that Jaeme was "a good guy, but weak and influenced by his board" and that Jaeme "always says the right things and then it changes."[229] Wechsler reasoned that "doing a bunch of calls with each board member saying $34B in volume etc just prolongs it."[230]

Wechsler also spoke with Malven that afternoon. Malven was on the SwervePay board and a partner of one of SwervePay's largest investors, 4490 Ventures.[231] Malven inquired about Ontario's projections of $43 million in revenue by 2024.[232] Malven noted that Ontario's projections suggested that Ontario's payments volumes were insufficient for SwervePay to achieve the earnout.[233] But Wechsler reassured him that the $43 million of projected revenue by 2024 did not include any synergies with SwervePay.[234]

---

[227] *See, e.g.*, JX-692 at 1.

[228] JX-708 at 1.

[229] JX-690 at 1.

[230] *Id.*

[231] PTO ¶¶ 70, 77; Trial Tr. at 448:22–449:5 (Malven).

[232] JX-717 at 1–3.

[233] *Id.*; *see also* Trial Tr. at 470:1–23 (Malven).

[234] Trial Tr. at 470:1–23 (Malven).

On February 10, Wechsler and Steffe had a conference call with Jaeme and some members of the SwervePay board.[235] Wechsler relayed that he had "strong equity incentives to drive EBITDA at Ontario based on a 2 year earn-out and that he was 4 months into the earn-out."[236] He suggested his "earnout would dovetail closely with the expected outside date for the proposed [SwervePay] earnout."[237] He also noted that he was hiring people from his prior, successful teams to help accelerate revenue and that he had handpicked Ontario's new CEO, who had more payments experience than the current one.[238] On the call, "Wechsler made it painfully clear that [SwervePay] did not have the luxury of trying to negotiate a significantly better deal or delay timing on a finalized deal."[239]

At SwervePay's two-day board meeting on February 11 and 12, Jaeme expressed doubts about remaining an independent company, noting that he had seen multiple situations where go-to-market partners preferred to control payments volume for themselves or expressed concern about SwervePay's size and stability.[240] He noted that if SwervePay rejected the deal, SwervePay would need to start looking for additional funding and risked a down round.[241] According to Malven, SwervePay

---

[235] JX-738 at 1.

[236] *Id.*

[237] *Id.*

[238] *Id.* at 1–2.

[239] *Id.* at 2.

[240] *Id.*

[241] *Id.*

had between 14 and 16 months of runway left at that time.[242]  Jaeme also argued that the companies that had previously shied away from SwervePay would want to work with them post-acquisition, given Ontario's financial backing and validation.[243]  To assuage concerns about the viability of the earnout, he noted that if SwervePay "could capture a relatively small piece of the $34,000,000,000 in payments that is estimated to run through Ontario," it could achieve the earnout.[244]  SwervePay's board approved the acquisition on February 12, 2020.[245]

### H.  Ontario Acquires SwervePay.

On February 24, 2020, OSC Investment, L.P. acquired SwervePay (the "Acquisition") under a Membership Interest Purchase Agreement (the "Purchase Agreement").[246]

In exchange for SwervePay, Sellers received (i) $9.9 million in cash, (ii) 1,000 Class A Units in parent company OSC Investment, L.P., valued at $100 per unit (the "Rollover Units"), and (iii) potential earnouts consisting of cash payments between $17,500,000 and $43,750,000 (the "Cash Earnout") and 100,000 Class A Units in OSC Investment, L.P. (the "Equity Earnout," and together with the Cash Earnout, the "Earnouts").[247]

---

[242] JX-745 at 1.

[243] JX-738 at 6.

[244] *Id.*

[245] JX-745 at 1; Trial Tr. at 515:5–24 (Malven).

[246] JX-841 (Purchase Agreement).

[247] PTO ¶¶ 6, 117; Purchase Agreement §§ 2.01, 2.10, 2.11.  Legacy SwervePay became a limited partner in OSC Investment, L.P. pursuant to a joinder to OSC

35

The Earnouts were contingent on SwervePay's post-closing performance between January 1, 2021 and December 31, 2021 (the "Earnout Period").[248] SwervePay would achieve the Cash Earnout if it generated at least $17.5 million in net payments revenue (as defined in the Purchase Agreement) by converting Ontario's existing payments volume within the Earnout Period.[249] Above $17.5 million, SwervePay would receive a Cash Earnout equal to the net payments revenue it generated from converting Ontario clients, capped at $43.75 million.[250] SwervePay would achieve the second earnout milestone if it generated at least $10 million in net revenue from new customers.[251] If SwervePay met either threshold, it would receive 100,000 units of OSC Investment, L.P. in the Equity Earnout, which the parties valued at $10 million.[252]

Also on February 24, 2020, Jaeme, Katrina, and Hamilton entered into employment agreements with SwervePay (the "Employment Agreements").[253] As

Investment, L.P.'s Limited Partnership Agreement. Purchase Agreement § 2.11(b); JX-279 (Limited Partnership Agreement); JX-1341 at 244.

[248] PTO ¶ 115.

[249] *Id.*

[250] *Id.* ¶ 117.

[251] *Id.* ¶ 115. This litigation centers on whether SwervePay would have received the Cash Earnout and, as a result, the Equity Earnout. Sellers do not contend that they would have met this new-customer earnout.

[252] *Id.*

[253] *Id.* ¶ 119; *see also* JX-845, JX-846, JX-848.

part of their employment, Jaeme and Hamilton each were awarded 7,250 profit interest units ("PIUs"), with vesting conditions on continued employment.[254]

## I. Issues With Worldpay Emerge.

SwervePay contracted with third-party vendors like Worldpay LLC for its payments infrastructure. The Purchase Agreement identified Worldpay as a "Material Vendor" and the contract with Worldpay (the "Worldpay Contract") as a "Material Contract."[255]

In the summer of 2020, Worldpay informed Jaeme that it had been acquired, and that it no longer wanted to process any debt collection.[256] That summer, Worldpay began shutting down service to SwervePay's collection clients and rejected Jaeme's attempt to onboard a new collection agency.[257]

By November, SwervePay decided to migrate clients off Worldpay's infrastructure.[258] And Jaeme negotiated a contract with another processor, Base Commerce.[259] In mid-November, Ontario executives signed off on a plan for completing the client transition to Base.[260] Ontario gave Jaeme freedom to do

---

[254] JX-1122 at 4–5, 22–23.

[255] Purchase Agreement §§ 3.14(a)(xi), (b), 3.22; JX-842 at Schedules 3.14(a), 3.22.

[256] Trial Tr. at 270:15–24, 298:7–12 (J. Adams).

[257] JX-1154; JX-1207.

[258] JX-1283 at 1; JX-2109 at 1.

[259] JX-1319; JX-1354 at 3; Trial Tr. at 305:14–19 (J. Adams).

[260] JX-2109 at 1.

whatever he needed for the transition because "it saves us costs over what" SwervePay paid Worldpay.[261]

When SwervePay tried switching clients to the Base platform, SwervePay experienced technical issues that had widespread impact.[262] On December 9, Worldpay shut down services to all of the SwervePay clients it had identified as debt collectors, including clients SwervePay had not yet transitioned to Base.[263]

In the end, when Ontario executives discussed bonuses the following month, they praised Jaeme for "proactively managing" the Worldpay transition and felt his efforts "set us up for cross-sell success."[264]

## J.      Relationships Sour.

In the spring of 2020, Ontario began discussing strategic shifts.[265] The Ontario board contemplated reductions-in-force and organizational redesign.[266]

O'Brien put Jaeme in charge of investigating the volume for the payments opportunity.[267] He tasked other employees, Blue Star, and McKinsey with the same exercise.[268] On April 29, 2020, Jaeme emailed Blue Star asking for their volume data because "everyone is struggling trying to find the $30B as discussed during our

---

[261] *Id.*

[262] Trial Tr. at 403:21–404:3 (Hamilton); *see also* JX-2188 at 15.

[263] JX-2111 at 5–7.

[264] JX-1333 at 1.

[265] JX-1984.

[266] *Id.* at 7–16.

[267] Trial Tr. at 214:4–11 (J. Adams).

[268] *Id.* at 66:17–67:12 (J. Adams).

diligence" and he was "hitting brick walls."[269]  That month, SwervePay initiated its "phase 1 rollout" of new software, offering SwervePay as a processing option for Ontario customers.[270]  A few months later, Ontario began to lay off employees, including members of the SwervePay team.[271]

By June, the teams still could not validate the $34 billion figure: McKinsey had arrived at a $26 billion estimate and Blue Star got to around $10 billion.[272]  On June 1, Durrett sent an email to Jaeme and other Ontario team members summarizing his previous discussions with McKinsey.[273]  In that email, Durrett stated that Ontario had a "top-down" estimate of approximately $30 billion that Blount had provided to them, but that they also had a $5.5 billion "bottoms-up," customer-by-customer estimate that Durrett had created.[274]

Jaeme, Durrett, and Ontario team members had a call with McKinsey to refine their estimates on June 8.  On the call, Durrett mentioned his "bottoms-up" estimate.[275]  And although Durrett had to drop from the call early, he circulated a

---

[269] JX-973 at 1.

[270] Trial Tr. at 1469:23–1470:16 (Hamilton).

[271] *Id.* at 70:24–71:21 (J. Adams).

[272] JX-1052 at 1–2.

[273] JX-1035.

[274] *Id.*; *see also* Trial Tr. at 922:16–923:4 (Durrett) (describing a "top-down" estimate as leveraging "independent third-party data [and] benchmarks," and a "bottoms-up" estimate as a customer-by-customer build up leveraging internal data and data from payment partners).

[275] Trial Tr. at 224:15–21 (J. Adams).

Google Sheets link to his "bottoms-up" estimate—his analysis from December 2019 showing a $5.2 billion payments volume—to Jaeme and the team.[276]

Although Durrett still felt there was a big opportunity, O'Brien could not see it.[277] On June 27, O'Brien expressed to other executives that Jaeme could achieve the Cash Earnout, but felt it was "going to be really tough" because "[t]he TAM is not there."[278]

Ontario's restructuring plans crystalized in July, when Ontario rolled out a reorganization and reduction-in-force in line with McKinsey's recommendations on cost cutting.[279] As part of the reorganization, Ontario laid off 58 employees, including three Legacy SwervePay employees, and demoted Jaeme.[280] Jaeme no longer reported directly to O'Brien, led payments at Ontario, or made key business decisions for payments.[281] Ontario removed all of Jaeme's direct reports, including top salespeople.[282] Ontario moved Hamilton from payments to a different project.[283] Conversions to SwervePay's software slowed to an average of 2.5 customers per month.[284]

---

[276] JX-1058; *see also* Trial Tr. at 224:15–227:19 (J. Adams).

[277] JX-1052 at 2–3.

[278] JX-1094 at 2.

[279] JX-1110 at 2; Trial Tr. at 70:17–23 (J. Adams).

[280] JX-1984.

[281] Trial Tr. at 72:24–73:1, 74:1–13 (J. Adams).

[282] *Id.* at 71:6–21 (J. Adams).

[283] *Id.*; JX-1214 at 1.

[284] JX-1787 ("Beach Opening Report") ¶¶ 59–60.

In light of these and other changes, Jaeme asked to modify the Cash Earnout by eliminating the distinctions between different revenue sources, adjusting the earnout calculation, and changing the award to a mix of equity and cash.[285] As justification, he cited Ontario's decision to focus on other projects, a previously undisclosed contract with another PayFac that limited SwervePay's ability to convert captive accounts to its software, and the parties' determination that Ontario's actual payments volume was somewhere between $6 and $8 billion.[286] O'Brien said that he would go to bat for the SwervePay team, but New Mountain, Blue Star, and Ontario ultimately refused to engage in the discussion.[287]

In a September 17 update to the Ontario board, O'Brien acknowledged that they were exhausting the payments conversion to Ontario and that they needed to pursue acquisitions to grow revenue.[288] In a draft presentation regarding acquisition discussions, Dubbioso lowered the Ontario payments volume estimate from $34 billion to $20 billion and then ultimately to $10 billion.[289]

In October, Ontario retained Houlihan Lokey to value the SwervePay acquisition, including the Earnouts, as of the date the acquisition closed.[290] Houlihan

---

[285] JX-1214 at 2.

[286] *Id.* at 1–2.

[287] Trial Tr. at 69:19–70:4 (J. Adams); *id.* at 490:16–24 (Malven).

[288] JX-1962 at 11.

[289] JX-1231 at 3; JX-1240 at 1.

[290] JX-1249 at 3.

Lokey valued the Earnouts at approximately $4.3 million—functionally "worthless," according to Houlihan Lokey's internal communications.[291]

Around this time, before the Earnout Period began, an Ontario employee who had previously worked for SwervePay told Jaeme that Houlihan Lokey stated that Ontario would have zero liability on the books for the Earnouts.[292] This prompted Jaeme to engage legal counsel.[293]

In November, New Mountain executives privately acknowledged that SwervePay would not achieve the Earnouts.[294]

## K. The Individual Sellers Leave Ontario.

By January 2021, the Individual Sellers had sent legal correspondence to Buyers.[295] In response, O'Brien offered Jaeme and Hamilton an "Incentive Proposal" of up to approximately $3.35 million ($2.1 million for Jaeme, and $1.25 million for Hamilton) on March 2, 2021.[296] The offer required Jaeme and Hamilton to release all claims against Buyers and transfer any rights under the Earnouts to them.[297] Jaeme and Hamilton refused Ontario's offer.[298]

---

[291] JX-1320 at 33; JX-1293 at 1.

[292] Trial Tr. at 79:14–80:6 (J. Adams).

[293] *Id.* at 80:9–11.

[294] JX-1960 at 9.

[295] JX-1370 (referencing a 1/29/21 demand letter).

[296] JX-1376 at 2.

[297] Trial Tr. at 83:1–84:2 (J. Adams); *id.* at 342:17–343:3 (Hamilton).

[298] *Id.*

On March 25, 2021, Jaeme was reviewing his emails in an effort to understand why the relationship with Buyers had broken down.[299] He found Durrett's June 8 email containing the link to a Google Sheet.[300] Jaeme did not recall reviewing the email when it was sent.[301] Jaeme clicked through the history of the spreadsheet to see how it was made and concluded that Buyers knew long before the acquisition closed that the $34 billion was based upon assumptions "10x" what Ontario's data was showing, and that Ontario's actual customer data reflected only a $5.2 billion payments volume opportunity.[302]

Tensions escalated after Jaeme and Hamilton refused the proposal.[303] By April, O'Brien was texting other Ontario executives about "getting rid of Jaeme Adams."[304] According to the Individual Sellers, Ontario executives began demanding that they immediately transfer knowledge and work, and Ontario also flooded them with tasks unrelated to converting payments volume or achieving SwervePay's Earnouts.[305]

Litigation seemed likely. On May 6, 2021, Jaeme, Katrina, and Hamilton signed litigation consultant agreements with SPOSC Investment Holdings, LLC

---

[299] *Id.* at 80:12–81:16 (J. Adams).

[300] *Id.*

[301] *Id.* at 226:16–18, 228:5–18 (J. Adams).

[302] *Id.* at 80:15–81:16 (J. Adams).

[303] *Id.* at 82:2–20 (J. Adams).

[304] Trial Tr. at 1455:15–1456:12 (O'Brien); JX-1428 at 2.

[305] Trial Tr. at 82:2–20 (J. Adams); *id.* at 341:4–342:16 (Hamilton); *id.* at 432:8–22 (K. Adams).

("SPOSC").[306] SPOSC engaged all three as "consultant[s] regarding a lawsuit between SwervePay and Ontario" and paid them annual salaries to pursue the litigation.[307]

On May 7, 2021, Alex Forman, Ontario's General Counsel, sent Jaeme and Hamilton another settlement and incentive agreement, which included a bonus component.[308] This proposal once again required Jaeme and Hamilton to release any claims related to SwervePay's Earnouts.[309]

On May 17, 2021, Ontario launched a five-day internal investigation into Jaeme, Katrina, and Hamilton.[310] The report recommended firing all three.[311] They were neither informed of nor interviewed for the investigation.[312]

Jaeme, Katrina, and Hamilton resigned on May 26, 2021.[313] They provided notice in a letter from their attorney, citing an increasingly hostile work environment and the fallout from their litigation against New Mountain.[314] There were still over six months left in the Earnout Period.[315]

---

[306] JX-79; JX-80; JX-81.

[307] JX-79 at 1; JX-80 at 1; JX-81 at 1.

[308] JX-1436.

[309] *Id.*; Trial Tr. at 1457:1–5 (O'Brien).

[310] JX-1485 at 1.

[311] *Id.* at 2.

[312] Trial Tr. at 445:13–18 (K. Adams).

[313] JX-1492.

[314] *Id.* at 1–2.

[315] PTO ¶ 115.

44

## L.    Litigation Ensues.

In May 2021, Sellers commenced this action against SwervePay Holdings, LLC; OSC Investment, L.P.; OSC Investment GP, LLC; OSC Payments, Inc.; New SwervePay (collectively, the "HoldCo Entities"); Blue Star Innovation Partners GP, LLC; New Mountain; Wechsler; Oshinsky; and Dubbioso.[316]  Three of the HoldCo Entities filed a competing complaint against Jaeme, Hamilton, and SPOSC in July 2021.[317]  The court consolidated the actions on August 31, 2021.[318]  Each side amended their complaint multiple times,[319] resulting in two dismissal decisions.[320]

Sellers' operative complaint contains eight counts.[321]  Post-trial, however, Sellers narrowed their claims to five.[322]  In Count I, Sellers bring a claim for fraudulent inducement against Buyers as it relates to the Purchase Agreement.  In Count II, Sellers bring a claim for conspiracy to commit fraud against Buyers.  In

---

[316] Dkt. 1.  Sellers later added the following defendants: Fund V LP; New Mountain Investments V, LLC ("Fund V GP"); Blue Star; and Eir Partners (collectively, the "Newly Added Defendants").  Buyers argued that the claims against the Newly Added Defendants are time-barred, and the court addressed this argument in a separate decision.  *See* Dkt. 658 (the "*Laches Decision*") at 3–11.

[317] C.A. No. 2021-0666-KSJM.

[318] Dkt. 36.

[319] *See* Dkt. 51 (Buyers' First Am. Compl.); Dkt. 236 (Buyers' Second Am. Compl.); Dkt. 238 (Sellers' First Am. Compl.); Dkt. 325 (Sellers' Second Am. Compl.); Dkt. 391 (Buyers' Third Am. Compl.); Dkt. 590 (Buyers' Fourth Am. Compl.).

[320] Dkt. 74 (*In re Swervepay Acq., LLC*, 2022 WL 3701723 (Del. Ch. Aug. 26, 2022)); Dkt. 470.

[321] Sellers' Second Am. Compl.

[322] Sellers dropped Counts VI and VIII seeking declaratory relief in connection with restrictive covenants in the Purchase Agreement and Employment Agreements. Sellers waived those claims by failing to pursue them.  *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

Counts III, IV, and V, Jaeme, Hamilton, and Katrina each bring a claim against Buyers for fraudulent inducement as to the Employment Agreements (together with Count I, the "Fraud Claims").

Buyers' operative complaint contains four counts of contractual fraud.[323] By the time of trial, however, Buyers had narrowed their case to a single issue concerning Sellers' relationship with, and representations and statements concerning, Worldpay.[324] Sellers argued that Buyers' sole remaining claim was time-barred, and the court entered judgment for Sellers on that claim in a separate decision.[325]

Discovery was hard-fought. The parties filed many motions to compel.[326] The court appointed Ryan P. Newell as Special Discovery Magistrate.[327] He did a great job. The court held trial from October 28 through November 1, 2024, and on February

---

[323] Dkt. 590.

[324] *See* Dkt. 573 ("Buyers' Pre-Trial Opening Br.") at 43–50.

[325] *Laches Decision* at 11–14.

[326] The parties filed five motions to compel before the court appointed a Special Discovery Magistrate. Dkt. 151 (Sellers' First MTC); Dkt. 152 (Sellers' Second MTC); Dkt. 153 (Sellers' Third MTC); Dkt. 206 (Buyers' First MTC); Dkt. 207 (Buyers' Second MTC); Dkt. 301 (appointing Special Discovery Magistrate). On July 15, 2024, Sellers filed a motion for sanctions over Buyers' spoliation, stating that Wechsler, Durrett, and Steffe had deleted texts while on litigation hold. Dkt. 474. On September 12, the Special Discovery Magistrate issued a report recommending that the court grant the motion in part and elevate the burden of proof by one level where Buyers bear the burden. Dkt. 517. The court did not impose this sanction.

[327] Dkt. 301; Dkt. 305.

13, 2025.[328]  The court heard post-trial argument on June 24, 2025,[329] and the parties

submitted their joint schedule of evidence on July 10, 2025.[330]

## II.    LEGAL ANALYSIS

Sellers assert four counts of fraud and one for civil conspiracy to commit fraud.

"Under Delaware law, the elements of fraudulent inducement and fraud are the

same."[331]  To prove fraud, Sellers must show:

> (1) a false representation, usually one of fact, made by the
> defendant; (2) the defendant's knowledge or belief that the
> representation was false, or made with reckless
> indifference to the truth; (3) an intent to induce the
> plaintiff to act or to refrain from acting; (4) the plaintiff's
> action or inaction taken in justifiable reliance upon the
> representation; and (5) damage to the plaintiff as a result
> of such reliance.[332]

Sellers bear the burden of proving each element by a preponderance of the

evidence.[333]

For each Count, Sellers rely on the same predicate—that Buyers fraudulently

induced them to enter into the Purchase Agreement and Employment Agreements by

misrepresenting Ontario's payments volume as $34 billion.  Because the same

---

[328] Dkt. 610; Dkt. 623.

[329] Dkt. 650.

[330] Dkt. 649.

[331] *Great Hill Equity P'rs IV, LP v. Sig Growth Equity Fund I, LLLP*, 2018 WL 6311829, at \*31 (Del. Ch. Dec. 3, 2018).

[332] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

[333] *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at \*9 (Del. Ch. Oct. 30, 2015), *judgment entered*, (Del. Ch. 2015), *order clarified*, (Del. Ch. 2015).

fraudulent act forms the basis of each of Sellers' counts, this decision streamlines the liability analysis, addressing each of Sellers' Counts together.[334]

## A. Material, False Representations

The first element of fraud requires Sellers to show that Buyers made false representations (or omissions) of material fact.[335] "A misrepresentation is an assertion that is not in accordance with the facts and is material if it would induce a reasonable person to manifest his assent."[336] Further, a party can be liable for fraud through silence when they have a duty to speak.[337] A duty to speak can arise where a party learns its prior representations are misleading and "disclosures are necessary to prevent statements actually made from being misleading."[338]

Sellers have proven that the HoldCo Entities, New Mountain, and Wechsler made material, false representations concerning Ontario's monetizable payments volume during negotiations or failed to correct material misrepresentations necessary to prevent fraud.

---

[334] *See* Dkt. 637 ("Buyers' Post-Trial Opening Br.") at 87–88 (arguing that the civil conspiracy and fraud claims rise and fall together).

[335] *E.I. DuPont De Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461–62 (Del. 1999).

[336] *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *12 (Del. Ch. Oct. 27, 2015).

[337] *Fortis Advisors LLC v. Johnson & Johnson*, 2024 WL 4048060, at *45 (Del. Ch. Sep. 4, 2024), *rev'd on other grounds sub nom.*, *Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229 (Del. 2026).

[338] *In re Enstar Corp.*, 593 A.2d 543, 550 (Del. Ch. 1991), *overruled on other grounds*, 604 A.2d 404 (Del. 1992); *see also Brody v. DCiM Sols., LLC*, 2025 WL 1802239, at *8 (Del. Ch. June 30, 2025).

Payments volume is a key financial metric for PayFacs.[339]  In exchange for their payment-related services, customers remit a percentage of all payments facilitated through the PayFac.[340]  Information on payments volume is material, and Buyers do not make arguments to the contrary.[341]

Buyers misrepresented Ontario's payments volume to Sellers.  Through much of negotiations, Sellers understood Ontario to have as much as $40 to $50 billion of payments volume flowing through its systems.[342]  Oshinsky only sent the February 8 Email with the $34 billion representation after Jaeme "pushed hard" in diligence "to understand/validate" the payments volume opportunity.[343]

Oshinsky sent the February 8 Email in response to Jaeme's request for "a summary of all monthly payment processing volume separated by processing platform."[344]  Jaeme stated that Sellers understood that "~$1B in payments have been monetized by Ontario and that there is an additional $40B-$50B that have not."[345]  He explained that Sellers were "trying to get the clearest picture possible of where that volume exists by platform/segment and how that may or may not impact

---

[339] Trial Tr. at 16:5–10 (J. Adams); *id.* at 1135:6–16 (Wechsler).

[340] PTO ¶ 56.

[341] *See generally* Buyers' Post-Trial Opening Br.

[342] Trial Tr. at 36:8–22, 44:1–7 (J. Adams); *id.* at 314:22–315:3, 317:24–318:7 (Hamilton).

[343] JX-669 at 1.

[344] *Id.* at 4.

[345] JX-655 at 1.

the ability for us to move it quickly to the Payfac."[346]  Jaeme also stated that he was trying to "identify the existing TAM *within the Ontario platform*" available for conversion.[347]  It was clear that Jaeme was looking for information on monetizable payments flowing through Ontario's platform.

But the $34 billion figure did not represent existing payments volume.  And Oshinsky sent it with no caveats.[348]  Because Jaeme asked for "existing" payments volume "within" Ontario's systems,[349] and Oshinsky responded with an estimate untethered to Ontario's existing volume, the February 8 Email misrepresented Ontario's monetizable payments volume.

Oshinsky copied Dubbioso, Wechsler, Steffe, and Carlson on the February 8 Email.[350]  They all knew that the figure was inaccurate.  None of them corrected it.

Buyers argue that Sellers failed to prove that the $34 billion estimate was false and "fraudulently conceived, from the get-go."[351]  And they go to great lengths to show

---

[346] *Id.*

[347] *Id.* (emphasis added).

[348] JX-685 at 1.  At trial, Oshinsky testified that he had a call with Jaeme during the morning of February 8, before he sent the February 8 Email.  He testified that he provided caveats to the $34 billion estimate on that call.  Trial Tr. at 840:16–841:9 (Oshinsky).  Jaeme had no recollection of this conversation.  *Id.* at 307:12–308:5 (J. Adams).  And Oshinsky's testimony on this point does not square with his emails to the broader New Mountain and Blue Star team, including his email asking the broader team if the $34 billion estimate was "at all reasonable to send."  JX-669 at 1. The court, therefore, cannot rely on Oshinsky's recollection.

[349] JX-655 at 1.

[350] JX-685 at 1.

[351] Buyers' Post-Trial Opening Br. at 54 (quoting *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 209 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007)).

that the $34 billion was a reasonable and well-supported industry-level estimate.[352] But, again, Oshinsky did not provide the $34 billion figure as an industry-level estimate. He provided the figure in response to Jaeme's request for a summary of "existing" payments volume "within" Ontario's platform.[353]

Buyers also claim that Oshinsky sent Jaeme "exactly what he requested" and that Jaeme was aware that the $34 billion figure in the February 8 Email was an estimate.[354] They rely on Oshinsky's text exchange with Jaeme on February 7, during which Oshinsky noted that Buyers had "put together a good framework to estimate" the questions Jaeme raised in his email.[355] But, again, the $34 billion used industry-wide assumptions and was unrelated to data showing what payments volume existed "within" Ontario's platform, which is what Jaeme unambiguously requested.[356]

Sellers have proven that Buyers made a material, false representation.

## B. Scienter

"As a matter of Delaware law, fraud 'require[s] a certain level of scienter on the part of the defendant; a misrepresentation must be made either knowingly, intentionally, or with reckless indifference to the truth.'"[357] To succeed on the Fraud

---

[352] *Id.* at 54–56.

[353] JX-655 at 1.

[354] Buyers' Post-Trial Opening Br. at 28, 30, 60.

[355] JX-657 at 2.

[356] JX-655 at 1.

[357] *Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *20 (Del. Ch. Mar. 9, 2022) (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004)).

Claims, Sellers must prove that Buyers acted with scienter—that is, that they knew the $34 billion representation was false.

Buyers do not dispute that they at least knew that the $34 billion figure was based on assumptions, benchmarks, and guesswork.[358] Nor could they. By December 2019—when Durrett conducted his analysis—Buyers knew that the $34 billion figure was not representative of the volume of payments flowing through Ontario's systems.[359] Indeed, in January and February 2020, New Mountain was working under the assumption that Ontario touched approximately $5 billion in monetizable payments, leveraging Durrett's analysis rather than the $34 billion estimate.[360] New Mountain began to use the $5 billion estimate when comparing Ontario to other potential acquisition targets.[361]

Sellers have proven that Buyers knew that the $34 billion representation was problematic, not just because it was based on guesswork, but because it was false. Before sending the $34 billion build-up, Oshinsky asked internally whether it was "at all reasonable to send," implying that he knew that it was not.[362] Oshinsky also asked Durrett, Wechsler, Dubbioso, and Steffe if there was "any intellectually honest way

---

[358] *See* Buyers' Post-Trial Opening Br. at 59–66.

[359] *See, e.g.*, JX-666 at 1 (contrasting analysis building up to estimate of $5 billion in payment volume with $34 billion figure); JX-544 at 1.

[360] *See, e.g.*, JX-586 at 1; JX-603 at 1; JX-734 at 1.

[361] *See* JX-586 at 1 (describing "Ontario's ~$5.5B in current volume"); JX-603 at 1 (describing Ontario as sitting on "$5B overall" of volume).

[362] JX-669 at 1.

to show the $34B in a build up,"[363] implying that there was not. Indeed, no one responded that the $34 billion estimate was, in fact, an "intellectually honest" way to respond to Jaeme's request.[364] Dubbioso described Wechsler's sign-off on the communication as a "CYA,"[365] which no one needs for forthright conduct. And the day after Oshinsky sent the $34 billion build-up, Wechsler emailed acknowledging that "what [Oshinsky] gave [Jaeme] is meaningless."[366] Indeed, Oshinsky sent the February 8 Email although, just hours earlier, Oshinsky stated on an internal New Mountain email thread that Ontario had "~$5B" in existing volume.[367] Moreover, throughout February 2020, Buyers continued modeling internally payments volume figures far lower than $34 billion.[368]

A preponderance of the evidence shows that Buyers were aware that the $34 billion representation was inaccurate. Sellers have proven scienter.[369]

---

[363] JX-666 at 1.

[364] *See* JX-673 at 1–2.

[365] JX-122 at 1.

[366] JX-689 at 1.

[367] JX-691 at 2.

[368] JX-733 at 1 (Durrett referring to the $5.5 billion figure as their "low-end estimate [] of annual volume potential today," which was higher than the $3.5 billion New Mountain modeled internally); JX-797 at 1 (Durrett stating his belief that the payments opportunity at Ontario was "more likely in the $6B-10B range").

[369] Buyers argue that Oshinsky's knowledge and actions cannot be imputed to New Mountain, Fund V LP, or Fund V GP because Sellers did not prove that Oshinsky was acting on their behalf during negotiations. They claim Oshinsky was acting on Ontario's behalf. Buyers' Post-Trial Opening Br. at 88–89. But Oshinsky was employed by New Mountain and was a member of Fund V GP. PTO ¶ 71. He was not employed by Ontario. And Oshinsky took direction from New Mountain director Dubbioso when sending the February 8 Email. *See* JX-689 at 1–2. Dubbioso

## C.    Intent To Induce

To make out a fraud claim, a plaintiff must also prove that the fraudulent statements were made to induce the plaintiff into acting.[370]  Sellers thus must prove that Buyers misrepresented the payments volume intending to induce Sellers to enter into the Purchase Agreement and Employment Agreements.

Sellers have done so.  Buyers knew that Jaeme wanted this data to relay to his board to obtain approval of the Acquisition.[371]  Their internal communications reflect this.  Reporting on a January 27 meeting with Jaeme, Oshinsky advised Wechsler, Woody, Blount, and Wolfe that

> Jaeme was pretty direct with his goal for the meeting. From their side, they want to understand how Ontario is going to be able to move payments volume technically, commercially and contractually on the platform. . . . *His goal is 'to be able to go back to his Board and confidently say they can hit the earnouts.'*[372]

---

communicated to Buyers that Oshinsky had done as instructed.  *Id.* at 1.  Oshinsky thus was acting in the scope of his employment at New Mountain and therefore an agent of New Mountain, Fund V GP, and the entities they controlled.  "Under Delaware law, 'the knowledge of an agent acquired while acting within the scope of his or her authority and the acts of agents in that scope are imputed to the principal.'"  *Cumming ex rel. New Senior Inv. Gp., Inc. v. Edens*, 2018 WL 992877, at *26 (Del. Ch. Feb. 20, 2018) (cleaned up) (quoting *Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *19 (Del. Ch. Dec. 20, 2012)).  The other Buyers further claim that even if Oshinsky is found to be acting on behalf of New Mountain, Fund V LP, and Fund V GP, Sellers did not prove that those entities took part in negotiations between Ontario and SwervePay.  But neither Dubbioso nor Oshinsky communicated that they were participating in negotiations solely on Ontario's behalf.  Again, neither individual was an Ontario employee.  PTO ¶¶ 71–72.  And they held themselves out as New Mountain team members.

[370] *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992).

[371] *See* JX-620 at 2; JX-662 at 1–2; JX-692 at 1, 3.

[372] JX-620 at 2 (emphasis added).

54

When Jaeme pressed for information on payments volume, Oshinsky expressed concern that sending Durrett's analysis showing $5.2 billion in monetizable payments could elicit a "bad reaction."[373] Buyers worried that Jaeme was "oriented around a $40-50B payments volume number."[374] So Carlson, Durrett, Wechsler, Dubbioso, and Steffe focused on negotiation tactics. They suggested that Oshinsky "[p]oint to the $34BN" to "*satisfy [Jaeme's] request*" and that he express "deal fatigue" so that they could end Sellers' diligence into Ontario's payments volume and close the deal.[375] Wechsler "signed off" on this approach.[376] Put differently, Buyers gave Jaeme a number that would "satisfy" him, which they knew to be false, for Jaeme to show to his board and secure deal approval.

Plain as day, Buyers acted with an intent to induce Sellers. Sellers have proven the third element of their fraud claim.

### D. Reasonable Reliance

"As part of any successful claim based on fraud or misrepresentation, there must be a showing that a false statement was made and that the complaining party's conduct was in justifiable reliance upon the misrepresentation."[377] Sellers must prove that they relied on the $34 billion estimate when they decided to sign the Purchase Agreement and the Employment Agreements. Delaware courts measure

---

[373] JX-676 at 1.

[374] *Id.*

[375] JX-689 at 1–3 (emphasis added).

[376] *See* JX-681 at 1; JX-122 at 1.

[377] *Hynansky v. Vietri,* 2003 WL 21976031, at *5 (Del. Ch. Aug. 7, 2003).

reliance in two ways. Courts assess reliance "as a matter of fact" and using a reasonableness standard.[378] Sellers have proven both.

### 1. Reliance In Fact

Sellers proved that they relied on Buyers' representation of $34 billion in payments volume when agreeing to enter into the Purchase Agreement and the Employment Agreements. Sellers agreed to the Acquisition because achieving the Earnouts presented a profitable opportunity.[379]

When presenting the deal to SwervePay's board, Jaeme explained that "if [SwervePay] could capture a relatively small piece of the $34,000,000,000 in payments that is estimated to run through Ontario," SwervePay should be able to achieve the maximum Cash Earnout.[380] On February 10, 2020, 4490 Ventures' Malven contacted Wechsler out of concern that Ontario's projected $43 million of revenue by 2024 suggested a payments volume that was insufficient for SwervePay to achieve the Cash Earnout.[381]

Buyers claim that Sellers did not in fact rely on the $34 billion estimate for three reasons.

First, they argue that Sellers would have agreed to the Acquisition regardless of Buyers' representations because they needed the sale for SwervePay's business to

---

[378] *Arwood*, 2022 WL 705841, at *23–24.

[379] *See generally* JX-738.

[380] *Id.* at 6.

[381] *See* JX-723; Trial Tr. at 469:23–470:23 (Malven).

survive.[382]   But there is no evidence that suggests that SwervePay had no other options—in fact, 4490 Ventures' Gregory Robinson felt that SwervePay had financing options superior to what Ontario provided.[383]   Buyers' contention does not overcome the evidence to the contrary.

Second, Buyers say that Sellers knew SwervePay could not process most of Ontario's payments volume because the Worldpay Contract did not allow payment processing for collection agencies, which constituted 75% of Ontario's total addressable market.[384]   But regardless of the terms of the Worldpay Contract, Sellers had been using Worldpay to process payments from collection agencies long before the acquisition.   As Sellers stated to Worldpay after the sale: "SwervePay has been boarding collection agencies with Worldpay for the last several years."[385]   Sellers did not view the practice as prohibited under the Worldpay Contract.[386]   And Sellers had every expectation that they would continue to serve collection agency customers using the Worldpay platform.[387]

Third, Buyers argue that Sellers did not rely on the represented $34 billion payments volume because they only needed a small slice of that payments volume to hit their earnouts.[388]   This is not a serious argument—the size of a slice depends on

---

[382] Buyers' Post-Trial Opening Br. at 66.

[383] Robinson Dep. Tr. at 68:11–19.

[384] Buyers' Post-Trial Opening Br. at 41–42, 66–67.

[385] JX-1216 at 8; *see also* Trial Tr. at 274:1–14 (J. Adams).

[386] *See generally* Trial Tr. at 250:6–256:6, 265:14–19 (J. Adams).

[387] JX-2137; *see also* Trial Tr. at 274:1–14, 297:11–298:12, 301:7–21 (J. Adams).

[388] Buyers' Post-Trial Opening Br. at 67.

the size of the pie. And Sellers were hyper-focused on payments volume in deal negotiations for that reason. Buyers knew that Jaeme intended to relay the payments volume to his board, which he did.[389]

Sellers have proven reliance in fact.

## 2. Reasonable Reliance

Sellers also have proven that their reliance was reasonable.[390] "Whether reliance was justified is a contextual inquiry and is 'judged by reference to the plaintiff's knowledge and experience' and 'the relationship between the parties.'"[391] A plaintiff that knows a misrepresentation is false cannot at the same time justifiably rely on it.[392] Due diligence efforts that fail to uncover the truth, on the other hand, can be evidence of reasonable reliance.[393] Conducting pre-closing due diligence means the plaintiff has "made efforts to verify the representation and discovered no reason to doubt its truth."[394]

---

[389] JX-620 at 2; JX-690 at 1–2; JX-738 at 6.

[390] The terms "reasonable reliance" and "justifiable reliance" are used interchangeably under Delaware law to describe the same legal concept. *See Arwood*, 2022 WL 705841, at *23 n.237 ("I need not distinguish between the two here because, in Delaware, 'reasonable reliance is equivalent to justifiable reliance.'" (cleaned up) (quoting *Reserves Dev. LLC v. Crystal Props., LLC*, 986 A.2d 362, 368 (Del. 2009))).

[391] *Id*. at *23 (footnote omitted).

[392] *Id*. at *24 ("[I]t is axiomatic that a plaintiff does not justifiably rely on a defendant's misrepresentation if the plaintiff knows that the representation is false.").

[393] *Great Hill*, 2018 WL 6311829, at *33.

[394] *Id*.

Buyers did not give Sellers access to Ontario's internal payments volume information other than through Buyers' statements.[395] That is why Jaeme pressed to verify the data, and why Buyers ultimately sent the $34 billion build-up through the February 8 Email. Sellers' efforts to validate the repeated oral representations of $40 to $50 billion in existing payments volume by requesting a written summary were diligent efforts to verify Ontario's payments volume, and Sellers had no reason to doubt the $34 billion estimate provided in the February 8 Email.

Buyers quibble with Sellers' diligence efforts. They raise arguments describing steps that Sellers could have taken instead of relying on the February 8 Email, including speaking to management, retaining advisors, or speaking with Durrett.[396] But the court's inquiry is not whether Sellers could have eventually discovered the truth had they continued to dig. The inquiry is whether Sellers' reliance on the false representation was reasonable.

It was. Sellers inquired about Ontario's monetizable payments volume several times.[397] Sellers then asked to see data allowing them to verify Buyers' statements

---

[395] Trial Tr. at 888:1–16 (Oshinsky).

[396] Buyers' Post-Trial Opening Br. at 67–69. Buyers also claim that Sellers waited until late in negotiations to investigate Ontario's payments volume. But Buyers' own witnesses attest that Jaeme was focused on Ontario's payments volume early on in the process. *See, e.g.*, Steffe Dep. Tr. at 108:18–109:18 (describing Jaeme as "trying to figure out what was there" to support the $40–$50 billion estimates from "Day 1"); Trial Tr. at 1394:21–1395:22 (Carlson) (describing Jaeme as "focused on the addressable market" at the October 2019 meeting in Las Vegas).

[397] *See, e.g.*, Trial Tr. at 36:8–22, 44:1–7 (J. Adams); *id.* at 314:22–315:3, 317:24–318:7 (Hamilton).

about $40 to $50 billion of payments volume.[398] Oshinsky would not have sent the February 8 Email containing the $34 billion estimate if Jaeme had not asked for it. Oshinsky's response, though false, was thus the result of Sellers' adequate diligence efforts, and it was reasonable for Sellers to rely on the February 8 Email.

Buyers cite *DeBakey Corp. v. Raytheon Service Co.* for the proposition that a party cannot prove reasonable reliance where their own diligence efforts proved inadequate.[399] But that case is inapposite. In *DeBakey*, the defendants brought a counterclaim for fraudulent inducement, claiming to have relied on the plaintiffs' misrepresentations concerning the size of the telemedicine market, even though they had also conducted a low-budget study on market size.[400] The court entered judgment against the counterclaimants, reasoning that they "did *not* rely solely on [the plaintiffs'] representations, but, instead had performed due diligence (however perfunctory) on their own."[401]

Here, Sellers did not seek diligence regarding the payments market generally. Rather, they sought information specific to Ontario—the payments volume within Ontario's system. Buyers were the most reliable source for that information and Sellers acted reasonably in relying on Buyers' representations.

---

[398] JX-655 at 1.

[399] 2000 WL 1273317 (Del. Ch. Aug. 25, 2000), cited at Buyers' Post-Trial Opening Br. at 68.

[400] 2000 WL 1273317, at *25.

[401] *Id.* at *26 (emphasis in original).

Buyers also argue that Sellers' failure to secure a contractual representation regarding Ontario's payments volume weighs against a finding of reasonable reliance.[402] This argument also fails. Parties to merger transactions can contractually circumscribe exposure to post-closing claims of fraudulent inducement. But Delaware law requires that they do so explicitly through unambiguous anti-reliance language.[403] Buyers do not dispute that the Purchase Agreement contains no anti-reliance language.

Buyers again rely on *DeBakey*, which is again distinguishable.[404] In *DeBakey*, the court found the plaintiffs were not justified in relying on the defendants' oral, extracontractual statements that they would provide additional financing for a joint venture.[405] But there, the joint venture agreement explicitly limited the defendants' funding commitment and granted the defendants discretion to terminate the agreement when they had met their funding obligations.[406] The defendants' promises to provide additional funding were expressly disclaimed by the joint venture agreement, and the court thus concluded that the plaintiffs "had to know that in any

---

[402] Buyers' Post-Trial Opening Br. at 69.

[403] *See Park7 Student Hous., LLC v. PR III/Park7 SH Hldgs., LLC*, 340 A.3d 614, 618 (Del. Ch. 2025) ("Delaware law has resolved this tension by requiring specific and unambiguous anti-reliance language to preclude a fraudulent inducement claim based on the defendant's pre-contract statements.").

[404] Buyers' Post-Trial Opening Br. at 69 (citing *Debakey*, 2000 WL 1273317, at *27–28).

[405] *Id.* at *22.

[406] *Id.*

contested proceeding the [] Agreement would control."[407] The court also noted that plaintiffs should have negotiated for the defendants' oral promise to be included in the agreement, because "the plaintiffs knew that they were subject to the very real risk that [the defendants] would rely upon the plain language of the written Agreement to terminate the joint venture."[408]

Here, nothing in the Purchase Agreement contradicted Buyers' representations regarding Ontario's existing payments volume. The *DeBakey* court's reasoning is thus inapplicable.

Sellers have proven that they reasonably relied on Buyers' false representations.

### E. Damages

The final element of a fraud claim is causally related damages.[409] To show causation, a plaintiff must prove the fact of damages "with reasonable certainty"[410] and "by a preponderance of the evidence."[411] Once a plaintiff proves causation, the plaintiff must provide "a reasonable method to calculate damages."[412] "In cases of fraud and fraudulent inducement, Delaware courts recognize two primary

---

[407] *Id.*

[408] *Id.*

[409] *Stephenson*, 462 A.2d at 1074.

[410] *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2021 WL 1592473, at *10 (Del. Ch. Apr. 23, 2021); *cf. Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015), *as corrected*, (Dec. 28, 2015) [*Siga II*].

[411] *Maverick*, 2021 WL 1592473, at *9.

[412] *Id.* at *10.

approaches for measuring the harm proximately caused by the defendant's fraud—benefit-of-the-bargain damages and out-of-pocket damages."[413] "In Delaware, prejudgment interest is awarded as a matter of right and computed the day payment is due."[414]

Sellers request five categories of damages, each tied to the consideration they would have received but for the fraud: the full value of the Cash Earnout, or $43,750,000;[415] the value of the Equity Earnout, which they calculate as $103.1 million to $218.6 million;[416] the increased value of the 1,000 Rollover Units that Sellers received at closing, which they calculate as $0.9 million to $2.1 million;[417] the value of Jaeme's and Hamilton's PIUs, which they calculate as $12.9 million to $29.7 million;[418] and payment equal to the salaries and bonuses that they would have received had they not been constructively discharged.[419]

This section proceeds in three parts, addressing: (1) causation, (2) damages valuation methodology and calculation, and (3) prejudgment interest.

The parties relied on experts for their damages cases. Sellers relied on the expert opinion of Murray Beach. Beach is highly qualified. He has over 45 years of

---

[413] *Id.* at *9.

[414] *Brown v. Ct. Square Cap. Mgmt., L.P.*, 2024 WL 1655418, at *2 (Del. Ch. Apr. 17, 2024), *aff'd*, 331 A.3d 1270 (Del. 2024).

[415] Dkt. 634 ("Sellers' Post-Trial Opening Br.") at 69.

[416] *Id.*; Beach Opening Rep. ¶ 3(b).

[417] Sellers' Post-Trial Opening Br. at 69; Beach Opening Rep. ¶ 3(c).

[418] Sellers' Post-Trial Opening Br. at 69; Beach Opening Rep. ¶ 3(e).

[419] Sellers' Post-Trial Opening Br. at 69.

experience as an investment banker, financial analyst, and C-suite executive, and is accredited in business appraisal.[420] Buyers proffered two rebuttal experts: damages expert Yvette Austin and payments expert Anthony Hayes. Each is highly qualified. Austin is a senior director at economic consulting firm Compass Lexecon. She has several years of experience in M&A valuation and credit and solvency analyses.[421] Hayes has worked as a management consultant for the payments industry for approximately 30 years, including as a founder of his own payments consulting firm and as a partner at Oliver Wyman.[422]

### 1. Causation

The parties dispute what Sellers must prove to demonstrate causation. As a reminder, the Purchase Agreement based the Earnouts on net payments revenue targets.[423] Those revenue targets depended on three key metrics: payments volume, take rate, and conversion rate.[424] Expressed as a formula: (net payments revenue) = (monetizable payments volume) × (take rate) × (conversion rate).

---

[420] Beach Opening Rep. ¶¶ 5–8.

[421] JX-1820 ("Austin Rebuttal Report") ¶¶ 1–7.

[422] Hayes Rebuttal Rep. ¶ 1.

[423] *See supra* § I.H.1. With some exclusions not relevant to this dispute, "Net Payments Revenue" is defined in the Purchase Agreement as "all payments based revenue generated from fees on payments transaction volume" less certain costs, charges, and negative amounts assessed. Purchase Agreement at 12, 16 (defining "Gross Payments Revenue" and "Net Payments Revenue").

[424] *See generally* Beach Opening Rep. ¶¶ 70–75.

The purpose of benefit-of-the-bargain damages is to put Sellers "in the position [they] would have held if [Buyers' representations] were true."[425] Due to Buyers' fraud, therefore, Sellers are entitled to use the represented monetizable payments volume of $34 billion in the above formula for purposes of calculating damages. Buyers do not dispute that the court should accept the misrepresentation as true for the purpose of calculating damages if Sellers prove fraud.

Sellers also argue that they may rely on the parties' pre-transaction expectations regarding other take and conversion rates for the purpose of calculating damages. They advance this argument although Sellers did not prove (and did not set out to prove) that Buyers misrepresented either metric. Sellers cite case law for the proposition that "[a] party is damaged in fact when it enters into an agreement it otherwise would not have but for the fraud."[426] According to Sellers, the causation element requires that they prove with reasonable certainty a single fact: that they entered into agreements that they otherwise would not have.[427] Once proven, Sellers

---

[425] *Fortis Advisors*, 2024 WL 4048060, at *52 (internal quotation marks omitted).

[426] Sellers' Post-Trial Opening Br. at 66 (citing, among others, *Maverick*, 2021 WL 1592473, at *10).

[427] *Id.* at 66–68. Buyers rely on *Smash Franchise Partners, LLC v. Kanda Holdings, Inc.*, 2023 WL 4560984 (Del. Ch. July 14, 2023), *aff'd sub nom. McLaren v. Smash Franchise Partners, LLC*, 319 A.3d 909 (Del. 2024), to argue that Sellers must prove that Buyers' misrepresentations were "a sufficiently significant cause of the earnout miss to impose liability." Buyers' Post-Trial Opening Br. at 73 (cleaned up). But that is not what the court held in *Smash Franchise Partners*. Rather, Vice Chancellor Laster found no liability for the defendants, focusing on causation but declining to address many other elements of fraud. Notably, the Vice Chancellor never found that the defendant induced the plaintiff to act. *Smash Franchise P'rs*, 2023 WL 4560984, at *18–19.

contend that they are entitled to the benefit of all their reasonable expectations entering the agreements *ex ante*. Applied here, Sellers argue that they are entitled to rely on the parties' pre-transaction expectations regarding take rate and conversion rate.

Sellers' framing of the issue, however, reduces Sellers' burden to demonstrating the but-for and not the proximate cause. As this court explained in *Smash Franchise Partners*, a claimant must demonstrate both to prove causally related damages:

> The necessary causal connection has two dimensions. First, the misrepresentation must be a factual cause of the harm—generally called a but-for cause—meaning that the harm would not have occurred but for the misrepresentation. Second, the misrepresentation must be the legal cause of the harm—generally called the proximate cause—meaning that the misrepresentation must be a sufficiently significant cause of the harm to impose liability.[428]

Entering into the agreements based on representations of payments volume is the factual or but-for cause of the harm. It is not necessarily the "sufficiently significant" or "proximate" cause.

Sellers have proven factual causation by proving that they relied on Buyers' $34 billion payments-volume representation when entering into the Purchase Agreement and Employment Agreements. Buyers dispute this point, arguing that Sellers would have sold SwervePay regardless of Ontario's payments volume.[429] But

---

[428] *Id.* at *19 (footnotes omitted).

[429] *See* Buyers' Post-Trial Opening Br. at 72.

as discussed above, Sellers were consistent in their testimony that they would not have done the deal if they had known the $34 billion was false.[430]  Sellers proved the point with reasonable certainty and by a preponderance of the evidence.

Sellers must also prove proximate causation.  To do so, Sellers must prove that the misrepresentation was "a sufficiently significant cause"[431] of the Earnouts miss on which they base damages.  In this context, Sellers must demonstrate that the earnout miss was a consequence of the alleged fraud as opposed to other nonculpable factors.[432]

According to Buyers, Sellers cannot prove proximate causation because SwervePay did not meet the take and conversion rates necessary to achieve the revenue targets entitling them to the Earnouts.

Buyers urge the court to rely on actual take and conversion rates from the Earnout Period.  To show actual take and conversion rates, Buyers rely on an earnout statement that Buyers created during this litigation (the "Earnout Statement").[433]

---

[430] *See supra* § II.D.1 (discussing reliance in fact); Trial Tr. at 55:23–56:12 (J. Adams); *id.* at 326:6–16 (Hamilton); *id.* at 482:1–14 (Malven).

[431] *Smash Franchise P'rs*, 2023 WL 4560984, at *19.

[432] *See Fortis Advisors*, 2024 WL 4048060, at *35; *see also LaPoint v. AmerisourceBergen Corp.*, 2007 WL 2565709, at *9–10 (Del. Ch. Sep. 4, 2007), *aff'd*, 956 A.2d 642 (Del. 2008) (holding that the acquirer breached its contractual duties to promote the target's products, but that the target failed to show that this breach caused the target to miss its earnouts).

[433] *See, e.g.*, Buyers' Post-Trial Opening Br. at 73–74; Trial Tr. at 714:18–715:3, 729:14–730:4, 782:15–783:23, 785:16–789:4 (Hayes); *id.* at 1299:15–1300:17, 1304:10–23, 1319:2–17 (Austin); JX-1673; JX-1676 (together with JX-1673, the Earnout Statement); JX-1677.

The Earnout Statement reflects take and conversion rates for 2021 of 0.17% and 12.5%, respectively.[434] But the Earnout Statement deserves no evidentiary weight due to Buyers' spoliation, as held in a separate decision.[435]

Scant evidence on take and conversion rates pepper the rest of the record. All indicators, however, suggest that the real metrics fell below pre-Acquisition expectations but exceeded the figures reflected in the Earnout Statement.

Before the Acquisition, the parties expected a take rate in the range of 0.7% to 1% or greater and a conversion rate sufficient for Sellers to meet the net revenue targets for the Earnouts.

Sellers anticipated take rates of 1% or greater.[436] This is most clearly evidenced in the financial model prepared by SwervePay board member Malven when

---

[434] Buyers' Post-Trial Opening Br. at 73–74 (citing Trial Tr. at 729:22–730:4 (Hayes); *id.* at 621:24–622:5 (Beach); *id.* at 1299:15–1300:17 (Austin); DDX-7.10; Austin Rebuttal Rep., Ex. 2).

[435] *See* Dkt. 657 (the "*Evidentiary Decision*"). Before trial, Sellers moved to preclude the Earnout Statement. *See* Dkt. 528; Dkt. 547. The Earnout Statement is hardcoded. *See generally* JX-1673. Sellers identified several errors or discrepancies in the Earnout Statement's calculations. *See, e.g.*, Dkt. 528 ¶¶ 8, 11–12; Dkt. 547 ¶¶ 15–16. Because Buyers failed to preserve or produce the Earnout Statement's source documents, Sellers lacked the ability to test the accuracy of its calculations, including the take and conversion rates. The court denied Sellers' motion without prejudice to Sellers reasserting their arguments at trial, to allow a fully developed trial record to inform the court's assessment of prejudice and the weight to assign the evidence. Dkt. 609 at 43:3–20. Post-trial and with the benefit of a fully developed record, the court determined in the *Evidentiary Decision* to give the take rate and conversion rate aspects of the Earnout Statement no weight. *Evidentiary Decision* at 9.

[436] *See generally* Trial Tr. at 47:12–48:2, 57:7–17 (J. Adams); Jaeme Dep. Tr. at 338:4–339:8 (testifying that he forecasted that SwervePay could achieve the full earnout by converting 13% to 14% of the $34 billion monetizable payments volume, implying a 1% take rate); Beach Opening Rep. ¶ 77.

68

analyzing the transaction for the SwervePay board (the "Malven Model"). In that analysis, Malven modeled a 1% EBITDA contribution rate, implying a take rate of 1% or greater.[437]

Buyers expected a take rate between 0.7% and 1%, with most evidence pointing to a rate higher than 0.9%.[438] A July 12, 2019 presentation by McKinsey to New Mountain showed a 1% take rate.[439] In January 2020, Blue Star's Durrett emailed Wechsler a script "to convince Swerve they can hit their earnout."[440] It included figures implying a 0.7% take rate "on the low end," with 0.85% achievable.[441] In a February 2020 email seeking Durrett's feedback, Oshinsky modeled around a 1% take rate.[442] Other internal communications among Buyers are to the same effect.[443] Buyers' representatives confirmed these expectations during depositions.[444] And it was Ontario's policy, after the acquisition, that conversions could not be priced at a

[437] JX-1729 (Malven Model). As discussed below, whereas take rate is a measure of net revenue, EBITDA contribution rate deducts direct and operating expenses not already reflected in net revenue. *See infra* § II.E.2.b.i(a).

[438] JX-226 at 56; JX-619 at 2; JX-666; JX-667 at 14; JX-791 at 5; JX-851 at 2; O'Brien Dep. Tr. at 188:7–189:14; Carlson Dep. Tr. at 364:3–20.

[439] JX-226 at 47, 56.

[440] JX-619 at 1.

[441] *Id.* at 2.

[442] JX-666 at 1.

[443] *See, e.g.*, JX-667 at 14 (1%); JX-791 at 7 (1.3%).

[444] *See* O'Brien Dep. Tr. at 188:7–189:14 (testifying that "everything that I heard is the take rate should have been around 1 percent"); Carlson Dep. Tr. at 364:3–20 (testifying that, although he believed at the time that the 1% take rate was "not far off," a 0.8% to 0.9% take rate would have been his assumption for the Ontario payments volume being converted to the SwervePay platform).

take rate of less than 0.9% without approval from an executive committee because a lower rate was below what Ontario "would consider a healthy deal."[445]

The range of the parties' pre-Acquisition expectations regarding conversion rate is broader,[446] but everyone expected that SwervePay would convert enough volume to achieve the Earnouts. Assuming $34 billion or more in payments volume, and a 1% or greater take rate, Sellers could have achieved the minimum net revenue targets with conversion rates as low as 5.5%. Sellers believed that the conversion rate would be significantly higher. Jaeme testified that he anticipated that one-third of customers would convert after 30 days' notice, one-third would require strong-arming, and one-third would be a harder sell.[447] Malven assumed that SwervePay would convert "all or nearly all" of the payments volume.[448] Buyers too aimed to convert 100% of the payments volume and expected to achieve at least 80%, as a January 2020 exchange between Oshinsky and Durrett reflects.[449] As of February 10, 2020, New Mountain assumed that SwervePay would convert 50% of Ontario's payments volume by 2020 and 100% by the end of the Earnout Period.[450]

---

[445] Rhodes Dep. Tr. at 76:2–77:17, 85:14–86:1; JX-1065 at 1.

[446] *See, e.g.*, JX-620 at 2; JX-714 at 1, 3; JX-851 at 3; JX-885 at 13; J. Adams Dep. Tr. at 200:7–20, 212:7–19, 338:4–339:8; Malven Dep. Tr. at 250:23–251:3; Durrett Dep. Tr. at 191:11–18; Blount Dep. Tr. at 299:25–300:21.

[447] Trial Tr. at 45:16–46:8 (J. Adams); Jaeme Dep. Tr. at 200:7–20, 212:7–19.

[448] Malven Dep. Tr. at 250:23–251:3.

[449] JX-620 at 1–2.

[450] JX-714 at 1, 3.

70

No one disputes that the parties' pre-Acquisition expectations on take and conversion rates did not pan out, although the real numbers are difficult to pin down in the evidentiary record.

Buyers' documents from 2021 suggest that Ontario had an actual take rate of 0.61% to 0.92%, far above the 0.17% reflected in the Earnout Statement. An October 2021 investor deck created by Blue Star discussing year-to-date performance projected a take rate of 0.92%.[451] And Ontario's February 3, 2022 board presentation reporting 2021 results stated a 2021 take rate of 0.61%.[452] Buyers argue that the 0.61% and 0.92% figures are blended rates that include customers that would not be counted under the Earnouts.[453] But there is nothing reliable in the record supporting this argument or isolating the actual figures for Cash Earnout customers, due in part to Buyers' spoliation.

Evidence reflecting the actual conversion rate for the relevant period is similarly lacking, but what exists shows figures higher than the 12.5% reported in the Earnout Statement. SwervePay's internal tracker as of October 2020 reflected that it had converted or "won" approximately 15.7% of the Ontario customers it had contacted.[454] As framed by Sellers, the document shows that SwervePay was on an

---

[451] JX-1690 at 15 ("Payments Margin 92 BPS").

[452] JX-1624 at 6.

[453] Dkt. 533 ¶ 43; *see also* Trial Tr. at 1326:2–1327:20 (Austin).

[454] JX-1243 ("Summary" tab, Row 12, Column B (62 customers "won"); Row 25, Column B (395 "Grand Total")); *see also* Hayes Rebuttal Rep. ¶¶ 177–78.

upward trajectory, converting roughly 16 customers per month.[455] And by May 2021, SwervePay had already converted nearly 20% of Ontario's OSG segment—the primary driver of the business[456]—with 12% of OSG customers in the active pipeline.[457] Had Sellers continued converting at this rate (16 customers per month), Sellers would have converted approximately 54% by the Earnout Period's conclusion.[458]

The parties point to many reasons for SwervePay's failure to achieve pre-Acquisition expectations on take rate and conversion rate. Sellers blame Buyers, and Buyers blame Sellers or nonculpable factors.

Sellers blame Buyers in myriad ways.

First, Sellers point to the reduction in force that began in the middle of 2020,[459] after which conversion rates dropped.[460] Sellers argue that: Buyers failed to prioritize

---

[455] Trial Tr. at 579:14–580:14 (Beach); PDX-1.23–24.

[456] Trial Tr. at 186:14–187:3 (J. Adams) (agreeing that OSG was the "primary driver of the business" and that it accounted for $26b of the $34b payments volume); JX-679 at 7; JX-1437 at 1–2; *see also* Trial Tr. at 390:20–23 (Hamilton); *id.* at 695:13–696:8 (Hayes).

[457] Trial Tr. at 1364:17–1365:17 (Dubbioso); JX-1437 at 1.

[458] Trial Tr. at 582:10–583:2 (Beach); PDX-1.24.

[459] According to Sellers, beginning in April 2020 and through the summer, Ontario reduced SwervePay's team of eleven by terminating several SwervePay employees, including one of SwervePay's top salesmen. Sellers' Post-Trial Opening Br. at 40 (citing Trial Tr. at 70:17–71:3, 71:6–21 (J. Adams)). And Ontario "demoted [Jaeme] so he no longer reported directly to Ontario's CEO, was no longer head of payments, and was no longer involved in making key business decisions for payments." *Id.* (citing Trial Tr. at 72:24–73:1, 74:1–13 (J. Adams)). Ultimately, Adams had no direct reports. *Id.* (citing Trial Tr. at 74:1–13 (J. Adams)).

[460] *See* Beach Opening Rep. ¶¶ 55–59.

the payments business, which they would have done if Ontario had $34 billion in payments volume;[461] Ontario would have devoted more resources to a forced conversion if Ontario had $34 billion in payments volume;[462] and increased payments volume would have increased take rate.[463] Aspects of Sellers' arguments resonate—the court cannot know what Ontario would have done had it had $34 billion in payments volume. But it is difficult to assess the magnitude of these arguments. It seems unlikely that even a $34 billion payments volume would have caused Ontario to totally abandon its companywide reorganization and reduction in force.[464] And Ontario was still invested in the conversion effort after the reorganization—it hired four employees to help with payments.[465] These arguments, therefore, deserve consideration but do not weigh in favor of adopting Sellers' pre-Acquisition expectations in full.

Second, Sellers argue that Buyers' fraud on payments volume necessarily infected take and conversion rates in other ways.[466] For this argument, Sellers rely on expert testimony that Beach did not disclose in his opening report and portions of Buyers' rebuttal expert's testimony that do not directly address the issue.[467] To the

---

[461] Sellers' Post-Trial Opening Br. at 74.

[462] *Id.* at 75.

[463] *Id.* at 90–91; Trial Tr. at 77:17–78:4 (J. Adams).

[464] JX-1984 at 7–16.

[465] Trial Tr. at 718:22–719:9 (Hayes).

[466] Sellers' Post-Trial Reply Br. at 59–60 & n.36.

[467] Sellers' Post-Trial Opening Br. at 90 (citing Beach's trial testimony discussing Hayes's deposition testimony), 101 n.43 (not disputing that Beach's opinions on this

73

extent this argument stands independent from Sellers' first point, it does support adopting Sellers' pre-Acquisition expectation as a whole.

Third, Sellers claim that Jaeme, Katrina, and Hamilton were constructively discharged in May 2021, which further impeded SwervePay's ability to achieve the Earnouts.[468] To show constructive discharge, Sellers must prove "working conditions so intolerable that a reasonable person would have felt compelled to resign."[469] Sellers argue that Buyers created hostile working conditions after Adams and Hamilton refused an incentive proposal in exchange for a release of their claims against Buyers.[470] Jaeme testified that the looming litigation made conditions "awkward," and that he received "multiple emails from multiple directions."[471] But "awkward" does not cut it; a claim of constructive discharge requires something more. The remaining evidence establishes strained working conditions at best, not enough to compel resignations.[472]

---

subject were not disclosed in his opening report); Sellers' Post-Trial Reply Br. at 59, 65–67.

[468] Sellers' Post-Trial Opening Br. at 48–50, 73; *see also* Sellers' Post-Trial Reply Br. at 57 n.34 (citing *Smith v. Del. State Univ.*, 47 A.3d 472, 477 (Del. 2011) ("Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes.")).

[469] *Del. State Univ.*, 47 A.3d at 477.

[470] Sellers' Post-Trial Opening Br. at 48–50.

[471] Trial Tr. at 82:5–20 (J. Adams).

[472] *Id.*; *id.* at 341:16–342:16 (Hamilton); *id.* at 432:8–22 (K. Adams). Further, although Ontario conducted investigations into Sellers' job performance, Sellers did not learn of this fact until after they resigned. *Id.* at 84:3–11 (J. Adams); *id.* at 445:7–18 (K. Adams); *id.* at 1459:21–1460:4 (O'Brien). An undisclosed investigation thus could not have contributed to their decision to resign.

Buyers blame Sellers or argue that multiple nonculpable factors depressed SwervePay's take and conversion rates.

First, Buyers note that because Ontario lacked the technical ability to force customer conversion, SwervePay had to convert customers one-by-one.[473] And some of Ontario's customers were not receptive to converting to SwervePay because of unattractive pricing, limited functionalities, loyalty to other PayFacs, and other reasons.[474] So Ontario slashed prices to generate sales, resulting in losses.[475] Buyers proved aspects of this narrative, including that Ontario lacked the technical ability to force conversion. But Buyers did not prove that this alone, or with other factors, was a significant intervening cause of the missed Earnouts.

Second, Buyers argued that Worldpay's termination of services to SwervePay diverted Ontario's attention away from converting customers to SwervePay.[476] But by the end of 2020, Ontario was praising Jaeme for how he handled the Worldpay migration.[477] And even amid the issues with Worldpay, SwervePay's internal tracker

---

[473] *Id.* at 961:6–20 (Durrett) (testifying that a forced conversion "did not turn out to be possible for the vast majority of the customers" because "on a technical basis, many of the customers had on-premise software. . . . you can't force a customer to change their software if you don't have control of the software itself").

[474] Buyers' Post-Trial Opening Br. at 76.

[475] *Id.*

[476] *Id.* at 74–75.

[477] JX-1333 at 1 (1/11/21 email summarizing "2020 Bonus Recommendations," stating: "Jaeme set us up for cross-sell success, was proactively managing to diversify our processing relationships so that we were prepared when Worldpay turned us off and then also identified a big margin opportunity for this coming year. know we wished he had done more on the payment strategy stuff through the summer. I net this out to hitting his target.").

reflected a trend in conversion rates that placed SwervePay on target to hit the Earnouts.[478]

Putting it all together, each side's efforts to blame the other or nonculpable reasons for lower take and conversion rates resonates to a degree. The record reflects at least a few nonculpable pressures affecting those metrics, but none of those pressures alone or in combination with the others could be viewed as the proximate cause of the missed Earnouts. And ultimately, one cannot know what business decisions Ontario would have made if the lie was true and they had $34 billion in payments volume.

The evidentiary landscape on take and conversion rates is best described as a treacherous wasteland. In search of secure footing in this space to analyze causation, the court reaches for hard evidence reflecting conservative reports of actual take and conversion rates. The most conservative actual figures supported by the record are the 0.61% blended take rate reflected in Buyers' board presentation reporting on year-end, and the 15.7% conversion rate reflected by Sellers' October 2020 tracker.

Using those conservative figures, Sellers would have achieved net revenue of over $34.6 million—far in excess of the $17.5 million minimum. Sellers have thus proven based on a preponderance of the evidence that the misrepresentation in payments volume was a significant and proximate cause of harm in the form of lost Earnouts. That is, Buyers' fraud was thus the but-for and proximate cause of damage to Sellers. Sellers have proven causation with reasonable certainty.

---

[478] *See* Trial Tr. at 579:14–580:14 (Beach); PDX-1.23–24.

At least, Sellers have proven causation with reasonable certainty as to harm connected to the missed Earnouts. Causation as to three categories of harm warrants further analysis.

The first concerns damages attributable to the Rollover Units. Although Sellers retained the Rollover Units, they argue that Buyers' fraud reduced the value of the Rollover Units, entitling Sellers to the difference between the units' represented value and their actual value.[479] Because the Rollover Units were granted to Sellers at closing, they are not dependent on the Earnouts. Buyers' arguments regarding proximate causation thus do not apply. Sellers have shown causation as to that category.

The second concerns damages attributable to the PIUs. Continuous employment was a vesting condition of the PIUs,[480] and thus Jaeme and Hamilton forfeited their PIUs when they left the company. Sellers argue in briefing that Jaeme and Hamilton were constructively discharged, effectively wielding their constructive discharge theory as a variant of the prevention doctrine.[481] But as discussed above, Sellers failed to prove this point.

Last, Sellers seek damages for "salaries and bonuses they would have received in the but-for world."[482] Sellers' claim for lost salaries and bonuses rests on their

---

[479] Sellers' Post-Trial Opening Br. at 69, 75–79.

[480] JX-1169 at 5 §§ 1.3(a), 1.3(c)(ii); JX-1170 at 5 §§ 1.3(a), 1.3(c)(ii).

[481] Sellers' Post-Trial Reply Br. at 57; *see generally Snow Phipps Gp., LLC v. KCake Acq., Inc.*, 2021 WL 1714202, at *52 (Del. Ch. Apr. 30, 2021) (discussing prevention doctrine).

[482] Sellers' Post-Trial Opening Br. at 69.

77

constructive discharge theory and fails for that reason.[483] Sellers also failed to make any effort to quantify the amount of these damages in briefing or otherwise develop evidence at trial to support this category of relief. Sellers thus did not prove entitlement to this category of damages.[484]

### 2. Methodology And Calculation

Although a plaintiff must prove causation with reasonable certainty, a plaintiff need not prove a sum certain in damages. Once a plaintiff has proven harm resulting from fraud, "[t]he *amount* of damages can be an estimate."[485] "The scope of fraud damages under [Delaware] law is broad."[486] And "Delaware courts place the burden of uncertainty where it belongs . . . on the wrongdoer, not the wronged."[487]

This discussion proceeds in two parts, first addressing damages tied to the Cash Earnout and then turning to damages based on the Equity Earnout and Rollover Units.

---

[483] *See* Sellers' Post-Trial Reply Br. at 57 ("Additionally, Individual Sellers were damaged by loss of their salaries and bonuses *when they were constructively discharged* shortly after refusing to sign away their fraud claims." (emphasis added) (footnote omitted)).

[484] Sellers also waived their claim to this relief by failing to meaningfully develop their position in briefing. *Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").

[485] *Siga II*, 132 A.3d at 1111 (emphasis in original).

[486] *Maverick*, 2021 WL 1592473, at *9.

[487] *Great Hill*, 2020 WL 948513, at *20.

### a. Cash Earnout

Under the Purchase Agreement, Sellers would achieve the Cash Earnout if SwervePay generated at least $17.5 million in net payments revenue from converting Ontario's existing payments volume within the Earnout Period.[488] Above $17.5 million, SwervePay would receive a cash payout equal to the net payments revenue it generated from converting Ontario clients, capped at $43.75 million.

To prove causation, Sellers demonstrated that they would have achieved the 2021 net-revenue target of $17.5 million had Buyers' misrepresentation been true. At a minimum, therefore, Sellers are entitled to damages for the Cash Earnout in the amount of the $17.5 million they would have earned absent fraud. But the court did not address (and did not need to address) when analyzing causation what level of net revenue Sellers would have achieved above the $17.5 million target. The level of net revenue dictates the level of Cash Earnout and thus the amount of damages for the Cash Earnout. The court must therefore broach the issue.

Sellers contend that they expected to earn the full Cash Earnout of $43.75 million when they entered into the Purchase Agreement and thus seek damages for the Cash Earnout in that amount.[489] As discussed in the causation analysis, Sellers have proven that they held this expectation.[490] Indeed, the contemporaneous evidence is compelling. As just one example, when presenting the Acquisition to

---

[488] PTO ¶ 115.

[489] Sellers' Post-Trial Opening Br. at 69.

[490] *See supra* § II.E.1.

Legacy SwervePay's board, Jaeme explained that if SwervePay "could capture a relatively small piece of the $34,000,000,000 in payments that is estimated to run through Ontario," it could achieve the earnouts.[491]

Buyers argue that awarding Sellers damages in the amount of the maxed-out Cash Earnout based solely on Sellers' pre-Acquisition expectations would be unfair. They advance two arguments on this point. First, they contend that Sellers' pre-Acquisition expectations must be risk-adjusted. Second, they say that a maxed-out Cash Earnout overcorrects for Buyers' fraud by assuming financial metrics that did not materialize in part for nonculpable reasons.

Buyers' first argument is that Sellers' pre-Acquisition expectations should be risk-adjusted.[492] Although Sellers expected to achieve the Earnouts, the Earnouts were not certain. Earnouts never are. Indeed, the purpose of contingent, post-closing consideration is to allocate risk related to uncertain future performance.[493]

Buyers make an excellent point. But they offer no reliable basis on which to quantify that risk. Buyers argue for a sizeable risk adjustment based on a draft letter by one of SwervePay's largest investors, a venture capital fund called 4490 Ventures. The draft letter was to 4490 Ventures' limited partners. In it, 4490 Ventures assigned

---

[491] JX-738 at 6. In fact, Jaeme expected SwervePay to reach the maximum Cash Earnout amount by the beginning of the Earnout Period. J. Adams Dep. Tr. at 338:4–339:8.

[492] Buyers' Post-Trial Opening Br. at 84–86.

[493] *Fortis Advisors*, 2024 WL 4048060, at *1 ("Earnout provisions are common risk allocation tools in merger agreements. . . . This contingent approach lessens the buyers' risk of overpaying where the seller's future performance is uncertain.").

only a 33% probability to earning the Cash Earnout and a 10% probability to earning the Equity Earnout.[494]  Buyers point to this letter as supporting a 67% discount to Sellers' expectations as to the Cash Earnout and a 90% discount to Sellers' expectations as to the Equity Earnout, PIUs, and Rollover Units.[495]  But the letter was drafted in June 2020, months after the Acquisition, never sent externally, and ultimately discarded because the author viewed the supporting model as flawed.[496]  Even Buyers' expert acknowledged that the letter's 33% probability for the Cash Earnout represented a combined probability of achieving the maximum of both Earnouts.[497]

Plus, applying a 67% discount to the maxed-out Cash Earnout would result in a figure below the $17.5 million minimum, which Sellers have already proven they would have received.  Thus, the 67% and 90% risk adjustments advocated by Buyers are both unsupported and unreasonable.

Moreover, applying an overall risk adjustment would effectively discount the direct subject of the fraud—payments volume—thereby placing the burden of uncertainty on the wronged and not the wrongdoer.

Buyers' second argument echoes their proximate cause argument and speaks more directly to the goal of expectation damages.  That goal is to correct for the fraud

---

[494] JX-1040 at 5.

[495] Buyers' Post-Trial Opening Br. at 86 n.20.

[496] Trial Tr. at 487:2–19 (Malven); *compare* JX-1060 (final letter) *with* JX-1040 (draft letter on which Buyers rely).

[497] Austin Dep. Tr. at 106:5–22, 109:10–13.

by placing the victim of the fraud in the position it would have held if the misrepresentations were true.[498] As Sellers argue, the value of expectations damages is thus "the difference between the actual and the represented values of the object of the transaction."[499] If Buyers' misrepresentations were true, then Ontario would have had $34 billion in payments volume. But there is no reason to fully credit Sellers' pre-Acquisition expectations as to other key metrics that were not risk adjusted, not misrepresented, and not achieved in part for nonculpable reasons. That would not compensate Sellers for the represented value of the transaction; rather, it would overcompensate Sellers based on reasonable but un-risk-adjusted and unmaterialized expectations.

Buyers again make an excellent point. And in a perfect world, the court would attempt to isolate the direct subject of the fraud—the payments volume—by using actual or risk-adjusted results for the other metrics. But that perfect world is not perfectly achievable here. As discussed above in this section, Buyers present no reliable way to quantify risk generally or as to specific inputs. And as discussed in the causation analysis, one cannot assume that Ontario would have made the same business decisions if it had the huge opportunity presented by $34 billion in payments volume. Plus, the record lacks clear indications of actual results on many key metrics, in part due to Buyers' spoliation.

---

[498] *Fortis Advisors*, 2024 WL 4048060, at *52.

[499] *Id.* (quoting *LCT Cap., LLC v. NGL Energy P'rs LP*, 249 A.3d 77, 91 (Del. 2021)).

Ultimately, this court has broad discretion in setting an amount of damages where, as here, a plaintiff has established causation and thus liability.[500] And Buyers' objections support downward adjustments to Sellers' damages model.

Thus, to set damages for the Cash Earnout, the court adopts the blended take rate of 0.61%. The court also selects the very bottom of the range of conversion rates—50%—relied on by Sellers' expert.[501] This figure loosely aligns with Sellers' 2020 conversion rate—had Sellers continued converting at this rate (16 customers per month), Sellers would have converted approximately 54% by the Earnout Period's conclusion.[502] Finally, the court makes the conservative assumption that payments volume would remain flat at $34 billion throughout the Earnout Period.[503]

For the Cash Earnout, therefore, Sellers are entitled to damages based on the representation that Ontario had $34 billion in payments volume, a 0.61% take rate, and a 50% conversion rate. The solution exceeds the $43.75 million Cash Earnout cap. Sellers are thus entitled to damages in the amount of the full Cash Earnout.

---

[500] *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *19 (Del. Ch. Sep. 10, 2018) (reflecting that remedies and liability flow from a finding of causation).

[501] Beach Opening Rep. ¶¶ 164, 171.

[502] Trial Tr. at 582:10–583:2 (Beach); PDX-1.24.

[503] As discussed *infra* § II.E.2.b, the $34 billion representation was as to the 2019 payments volume. All parties assumed payments volume would grow. But Sellers' expert does not apply a growth rate to the payments volume when analyzing damages for the Cash Earnout. *See* Beach Opening Rep. ¶¶ 105–17. The court thus uses the $34 billion figure.

### b. Equity Earnout And Rollover Units

Sellers seek damages based on the three equity-based components of the deal: the Equity Earnout, the Rollover Units, and the PIUs.[504] Because Sellers did not prove causation as to the PIUs, this analysis values damages as to the Equity Earnout and Rollover Units, referred to generally as the "equity-based damages."

Sellers selected a valuation date of December 31, 2024 (the "Valuation Date").[505] They derive this date from models relied on by SwervePay's board when approving the Acquisition that assumed that Legacy SwervePay would exit its investment in Ontario on December 31, 2024.[506] Buyers do not take issue with Sellers' Valuation Date.[507] This decision thus values the equity-based damages as of December 31, 2024.

Sellers value the equity-based damages as of the Valuation Date based on their *pro rata* portion of the expected equity value of a combined SwervePay and Ontario entity. To calculate the combined company's value, Sellers proffer two guideline public companies analyses—one prepared by 4490 Ventures' Malven pre-Acquisition (the Malven Model, discussed above),[508] and one prepared by Sellers' damages expert

---

[504] OSC Investment, L.P. is the entity that holds SwervePay and Ontario's standalone business, so the parties refer to what this decision defines as the Equity Earnout as the "OSC Earnout." PTO ¶¶ 23, 65.

[505] Beach Opening Rep. ¶ 118.

[506] JX-780; *see also* Beach Opening Rep. ¶¶ 43, 118.

[507] *See, e.g.*, Trial Tr. at 1322:9–1323:2 (Austin); Buyers' Post-Trial Opening Br. at 84 & n.19, 86–87.

[508] *See* Sellers' Post-Trial Opening Br. at 79–80 (claiming that the Malven Model is "an independent basis for Sellers' damages").

Murray Beach (the "Beach Model"). A guideline public companies analysis values a private company as of a valuation date by multiplying the private company's EBITDA by contemporaneous measures of multiples of enterprise value to EBITDA drawn from comparable public companies.[509]

Malven created his model for SwervePay before the Acquisition using *pro forma* financials provided by Buyers and the represented $34 billion payments volume. He calculated that the Acquisition would generate an exit value totaling approximately $214 million in five years.[510] Beach drew on Malven's assumptions as an indication of Sellers' pre-Acquisition expectations, and his damages computations landed in a similar range. Beach valued (i) the Equity Earnout of 100,000 units at $103.1 million to $218.6 million,[511] and (ii) the 1,000 Rollover Units at $0.9 million to $1.2 million.[512]

Buyers attack Sellers' damages models in three ways. First, they contend that Sellers are not entitled to damages for the Equity Earnout because they would not have achieved the net revenue targets, but this decision has already rejected that argument.[513]

Second, they contend that each of Sellers' models should be rejected as overly speculative. In this criticism, Buyers do not argue that a guideline public companies

---

[509] Aswath Damodaran, *Investment Valuation* 453–67, 695–98 (Wiley, 3d ed.).

[510] Trial Tr. at 480:5–17 (Malven).

[511] Beach Opening Rep. ¶ 180.

[512] *Id.* ¶ 182.

[513] *See supra* § II.E.1.

analysis is an inherently flawed method for calculating damages. Rather, they argue that the Malven Model is inherently speculative. And at trial, Malven admitted as much, agreeing that his model "wasn't scientific at all."[514] He believed at the time of closing it was "[t]oo early to speculate" whether Sellers would receive any Earnout consideration.[515] Buyers likewise note that the Beach Model draws on the Malven Model and results in broad damages ranges. In essence, Buyers argue that Malven's imprecision and Beach's broad ranges warrant rejecting both models entirely.

Rejecting both of Sellers' models entirely would be extreme and unreasonable. It is true that the Malven Model was never intended to be relied on as a damages model, and it thus lacks the methodological rigor of an expert opinion. But that is why Sellers introduced a damages expert, and Beach corrects for Malven's informality by applying a more thoughtful methodology. For this reason, the court's analysis focuses on the Beach Model.

Beach's failure to calculate a sum certain does not render his model inherently unreliable. Once a party has established that it has been harmed, the calculation of its damages need not be determined with "mathematical accuracy and are often at best approximate."[516] "Where the injured party has proven the *fact* of damages . . . less certainty is required of the proof establishing the *amount* of damages. In other words, the injured party need not establish the amount of damages with precise

---

[514] Trial Tr. at 523:2–524:23 (Malven).

[515] JX-835 at 1.

[516] *Siga II*, 132 A.3d at 1133 n.138; *see also Maverick*, 2021 WL 1592473, at *10 (noting damages must be reasonably calculated but not mathematically certain).

certainty 'where the wrong has been proven and injury established.'"[517] The fact that Beach proffered ranges—even broad ones—is not a reason to outright reject his model.

Last, Buyers challenge Beach's inputs. And this decision meets the parties on that playing field. In calling balls and strikes on the inputs to the guideline public companies analysis, the court searched for the most reliable inputs with the aim of compensating, but not overcompensating, Sellers for Buyers' fraud. For reasons already stated, Sellers' model requires downward adjustments. So where appropriate, the court selected figures in the lowest end of the range of inputs relied on by Sellers' expert. But where Sellers' expert proffered no range or the range is overstated, the court turns to Buyers' supported alternative or reliable evidence of actual performance as a mechanism for risk adjustment.[518] This approach results in a mishmash of inputs—some based on pre-Acquisition expectations and others based on post-Acquisition performance. This theoretically eccentric approach is what the idiosyncrasies of the trial record—and the goals of fashioning expectation damages

---

[517] *Siga II*, 132 A.3d at 1131 (emphasis original) (footnote and internal quotation marks omitted); *see Total Care Physicians, P.A. v. O'Hara*, 2003 WL 21733023, at *3 (Del. Super. July 10, 2003) ("The quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage.").

[518] "Damages are measured at the time of the fraudulent transaction." *Maverick*, 2021 WL 1592473, at *9. And this decision measures damages at the time of the transaction, using post-Acquisition performance as substitutes for risk adjustment given the lack of alternative options.

in this context—demand.[519] And the idiosyncrasies of this trial record underscore why a trial court is granted broad discretion in setting the amount of damages.

Beach's guideline public companies analysis has three parts. First, Beach estimates the EBITDA of the combined SwervePay/Ontario at the time of the Valuation Date, assuming the misrepresentations were accurate. Second, he applies valuation multiples derived from a guideline public companies analysis to the combined EBITDA to generate the enterprise value. Last, he deducts net debt and adds cash from the exercise of options and incentive units to get equity value and then calculates the *pro rata* value of the equity Sellers would have received.

### i. Combined EBITDA

To calculate the EBITDA of a combined SwervePay/Ontario entity as of the Valuation Date (the "Combined EBITDA"), the Beach Model first calculates the EBITDA that SwervePay would have achieved had the misrepresentation been true (the "Incremental EBITDA"). To do so, he uses assumptions for growth, conversion, and contribution rates and then converts his estimate to an annual figure by adding the increasing per-month EBITDA figures through a last-twelve-month calculation (the "LTM Adjustment"). He then adds the adjusted Incremental EBITDA to Ontario's projected standalone EBITDA (the "Standalone EBITDA"), which generates the Combined EBITDA.

---

[519] *Merlin P'rs LP v. AutoInfo, Inc.*, 2015 WL 2069417, at *7 (Del. Ch. Apr. 30, 2015) ("The Court may . . . make adjustments to a proffered model[.]").

88

### (a)    Incremental EBITDA

To calculate the Incremental EBITDA as of 2024, Beach assumed a 2019 monetizable payments volume of $34 billion.  To project the payments volume five years out, he multiplied the $34 billion volume by a selected growth rate plus one, raised to the fifth power.  To calculate EBITDA that would have resulted from that payments volume, he multiplied the result by a conversion rate and an EBITDA contribution rate.[520]  Expressing Beach's approach as a formula: (Incremental EBITDA) = (2019 monetizable payments volume) × (1 + annual growth rate)^5 × (conversion rate) × (EBITDA contribution rate).

Beach argues that it is appropriate to base each input on the parties' reasonable expectations at the time of the Acquisition, and Buyers criticize that approach for reasons already discussed—accepting *all* expectations without isolating the misrepresentation and without risk-adjustment results is a windfall to Sellers. As discussed above, Buyers' criticisms warrant downward adjustments to Beach's calculations.

*Growth Rate.*  The growth rate is the yearly growth in payments volume between 2019 through the Valuation Date.[521]  Beach selected an 8% growth rate based on Sellers' pre-Acquisition expectations reflected in the Malven Model.[522] Malven based his assumption on his research into the historical growth of medical

---

[520] Beach Opening Rep. ¶¶ 118–19, 129–40.

[521] *Id.* ¶ 118.

[522] *Id.* ¶ 164.

debt.[523] The bulk of the Buyers' internal communications, however, show that they expected 5% annual growth.[524] These communications include discussions of advisor-led diligence before New Mountain acquired Ontario,[525] and a deck from a strategy session held after New Mountain acquired Ontario, where New Mountain, Ontario, McKinsey, and Eir Partners discussed the payments opportunity.[526] Given the relative reliability of Buyers' internal models, and Beach's failure to risk-adjust Sellers' expectations, the court adopts a 5% growth rate.[527]

---

[523] Malven Dep. Tr. at 198:18–199:6.

[524] *See, e.g.*, JX-297 at 60 (slide deck from 9/18/19 meeting of New Mountain, Ontario, McKinsey, and Eir Partners, reflecting 5% annual growth in payments volume); JX-228 at 2 (7/17/19 email from New Mountain's Dubbioso to Carlson and Oshinsky discussing Ontario diligence, modeling a payments volume growth rate of 5% per year); JX-234 at 6 (7/21/19 email from New Mountain's Dubbioso regarding Ontario diligence modeling a payments volume growth rate of 5% per year); JX-236 at 54 (7/22/19 presentation assuming 5% annual growth rate in payments volume).

[525] JX-228 at 2; JX-234 at 6; JX-236 at 54.

[526] JX-297 at 60.

[527] Beach opines in his report that the 5% growth rate does not account for Ontario acquiring additional sources of payments volume after the Acquisition. Beach Opening Rep. ¶ 165. And there was reason to believe that Ontario would do so. For example, Eir Partners stated in 2018 that they had "created an active list of over 35 acquisition candidates into a potential SwervePay platform; 4 are under NDA and 6 in active discussions / meetings." *Id.* ¶ 166; JX-386 at 5. Oshinsky also wrote an email to Jaeme and others in February 2020, identifying large "key logos" whose payments volume would be convertible post-Acquisition. Beach Opening Rep. ¶¶ 168–69; JX-695 at 1. Sellers were also aware of New Mountain's intended acquisition of RevSpring, which would have added $6 billion in monetized payments volume. Beach Opening Rep. ¶ 170; J. Adams Dep. Tr. at 376:15–22. But Beach does not show whether those acquisitions were likely or to what extent those acquisitions would have added to the annual payments volume growth rate.

*Conversion Rate.* The conversion rate is the percentage of monetizable payments volume that would be converted by the Valuation Date.[528] Beach selected a range of conversion rates of 50% to 80% based on the parties' pre-Acquisition expectations, subject to a sensitivity range.[529] Consistent with the effort to risk-adjust Sellers' expectations, and further in line with aspects of Buyers' criticisms of Beach's range, this decision assumes a conversion rate of 50%.[530]

*Contribution Rate.* The EBITDA contribution rate is the percentage of EBITDA that Ontario would earn on its converted payments volume.[531] The EBITDA contribution rate is similar to, but typically lower than, the take rate.[532] This is because, unlike the take rate, the EBITDA contribution rate takes into account direct and operational costs.[533] Beach selected a range of EBITDA contribution rates of

---

[528] Trial Tr. at 562:8–18 (Beach).

[529] Beach Opening Rep. ¶ 164; *see also supra* § II.E.1 (discussing the parties' pre-Acquisition expectations on conversion rate).

[530] Buyers argue for an even lower conversion rate, contending that it is reasonable to assume that SwervePay would have a declining conversion rate over time. In his report, Hayes explains that PayFacs commonly experience a decline in conversion rates. Hayes Rebuttal Rep. ¶¶ 212–17. Hayes' testimony is compelling, but he does not testify as to a rate of decline or a final value for conversion rates. By selecting the *lowest* conversion rate in the range proffered by Sellers' expert, the court accounts for this objection and appropriate risk adjustment.

[531] Beach Opening Rep. ¶ 118.

[532] *Id.* ¶ 118 & n.191.

[533] *Id.* Buyers often expressed EBITDA as a percentage of net payments revenue. *Id.* That percentage was referred to as the EBITDA margin. *Id.* As an example, if New SwervePay facilitated $1 billion of payments and earned a 1% take rate, net revenue would equal $10 million. *Id.* After accounting for direct and operational costs, Buyers determined the EBITDA margin was 75%. *Id.* That equates to $7.5 million in EBITDA earned by the payments business. *Id.* The EBITDA contribution rate is

0.67% to 1%.[534]  He relied foremost on the Malven Model, which assumed a 1% EBITDA contribution rate based on Malven's discussions with Wechsler.[535]  He also relied on evidence discussed in the Cash Earnout analysis reflecting that Buyers expected a 0.67% to 0.75% EBITDA contribution rate.[536]  Consistent with the court's analysis of Cash Earnout damages, and the notion that the EBITDA contribution rate is typically no higher than take rate, this court uses a contribution rate of 0.61%.

### (b)    LTM Adjustment

Beach backs out annual EBITDA for 2024 using a last twelve month ("LTM") calculation.  Beach's annualized Incremental EBITDA reflects the run rate achieved at the end of 2024, not the EBITDA earned throughout that year.[537]  Because his model assumes that EBITDA increased evenly from March 2020 through the

---

then calculated by determining what percentage of the facilitated payments volume ($1 billion) became EBITDA ($7.5 million).  *Id.*  In the hypothetical case, that would be 0.75% ($7.5 million / $1 billion).  *Id.*

[534] *Id.* ¶ 164.

[535] *Id.* ¶ 146; JX-1732.

[536] Beach Opening Rep. ¶ 144.  Buyers initially expected an EBITDA contribution rate of about 0.64%.  JX-234 at 5; JX-236 at 54; JX-297 at 60; JX-429 at 33.  But they increased their expectations by mid-December 2019.  For example, Durrett took a "first cut at opportunity sizing" in December 2019, estimating that Ontario's EBITDA contribution rate was 0.99%.  JX-519 at 1.  He noted in a January 2020 email that the estimated EBITDA contribution rate was 0.75%.  JX-578 at 2; *see also* Ward Dep. Tr. at 227:13–23 (Ontario Senior Vice President representing that, as of July 2024, Ontario's take rate was approximately 0.91%).  Austin calculated the EBITDA contribution rate using the 2022 EBITDA margin for the entire company (8.7%).  Trial Tr. at 1328:3–7 (Austin); PDX-1.50, 53–56.  But that approach ignores that the appropriate EBITDA margin is the payments business EBITDA margin, which was 69.2% in 2022.  This is because entire-company EBITDA includes one-time charges and other expenses that have nothing to do with payments.  Trial Tr. at 611:21–612:11 (Beach); PDX-1.53–56.

[537] Beach Opening Rep. ¶¶ 175–77.

Valuation Date, Beach treats each month of 2024 as a progressively higher point along that 58-month ramp. To calculate total EBITDA in 2024, he developed a formula that averages the monthly EBITDA attributable to January and December 2024 and multiplies that average by twelve to calculate the Incremental EBITDA generated during the last twelve months.[538] This adjustment avoids overstating EBITDA by assuming that the December 2024 run rate existed throughout the entire year. This approach is reasonable.[539]

### (c) Standalone EBITDA

Beach did not offer a range for the Standalone EBITDA. Based on pre-Acquisition expectations, he pegs Ontario's Standalone EBITDA on the Valuation Date at $76.6 million.[540] He derived this figure from an Ontario slide deck prepared for Jaeme during February 2020 diligence stating that Ontario's projected 2024 "Organic EBITDA" was $86.6 million.[541] Following Malven's lead, he then subtracted $10 million from the projected figure. Malven did this to prevent double-counting

---

[538] *Id.* ¶ 176 & n.281. Expressed as a formula: LTM EBITDA = Monthly EBITDA Increment × Average Month Placement × Number of Months, or $[A/(12T)]\times[(S+E)/2]\times(E-S+1)$, where A is the annualized EBITDA run rate at the end of the ramp, T is the total number of months in the ramp, and S and E are the placements of the first and last months in the LTM period. Here, the ramp extends for 58 months, January and December 2024 occupy positions 47 and 58, and the LTM period contains 12 months. The formula is therefore $[A/(12\times58)]\times[(47+58)/2]\times12$. The Beach Report contains a typo when describing this formula—it should have read that 47 equals the number of months between March 2020 and January 2024. *See id.*

[539] Nowhere do Buyers dispute this methodology. *See* Buyers' Post-Trial Opening Br., Buyers' Post-Trial Reply Br.

[540] Beach Opening Rep. ¶ 177.

[541] JX-632 at 3; Beach Opening Rep. ¶ 177.

93

"some amount of payments value."[542] Beach did so to account for losses associated with terminating a revenue sharing agreement with BillingTree.[543] Buyers' expert Austin replaced Beach's assumptions with actual post-closing results, using a Standalone EBITDA of $29.7 million.[544] This decision follows Austin's approach to avoid awarding damages for equity based on an exaggerated value and un risk-adjusted expectations.[545]

### ii. EBITDA Multiple

Beach determined the expected EBITDA multiple was between 18x and 20x.[546] Documents prepared at the time of the Acquisition show that Sellers expected multiples between 18x and 40x,[547] and Buyers expected multiples between 17x and 20x.[548] New Mountain's fourth-quarter valuation of its interest in Ontario contained

---

[542] *See* Trial Tr. at 478:10–23 (Malven) (discussing Malven Model).

[543] JX-666 ("Summary Analysis" tab); Beach Opening Rep. ¶ 177 n.283 (". . . $1.52 million in expected revenue share in 2019 based on $1.094 billion in payments volume, which translates to a $2.24 million expected revenue share in 2024. $2.24 million = $1.52 million x (1 + 8%)^5."). Beach applied an 8% growth rate when evaluating Sellers' decision to deduct $10 million for the BillingTree losses, concluding that the deduction is "both reasonable and conservative." *Id.*

[544] Austin Rebuttal Rep. ¶ 85.

[545] *See* Buyers' Post-Trial Opening Br. at 86; Austin Rebuttal Rep. ¶ 52. Austin based this input on a March 31, 2024 investment memo that represented Ontario's enterprise value as "$585.9 million" or 19.7x "2024 PF EBITDA (run-rate)." *See* Austin Rebuttal Rep. ¶ 52 & n.83 (citing JX-1764 at 2 and Delgado Dep. Tr. at 208:7–15 (explaining that the purpose of the memo is to report to New Mountain investors on the valuations of portfolio companies)).

[546] Beach Opening Rep. ¶¶ 153–62; Trial Tr. at 599:5–20 (Beach).

[547] Beach Opening Rep. ¶ 154; JX-632 at 5; JX-1732; JX-835.

[548] A June 2019 introductory presentation given within New Mountain stated Ontario could reach a 20x multiple with an embedded payments business. JX-189 at 11;

94

an analysis of multiples for healthcare technology companies and payments technology companies.[549] The report used several multiples, including a ratio of the companies' enterprise value to their last twelve months' EBITDA.[550] The healthcare technology companies had median and average enterprise value to last twelve months EBITDA multiples of 20.1x and 21.3x, respectively.[551] The payments technology companies had median and average multiples of 24.7x and 29.7x, respectively.[552] Combining the companies in a single sample resulted in median and average multiples of 21.4x and 25.2x.[553] A multiple at the high end of Beach's range, 20x, is thus is reasonable and supported by the record.

Putting it all together: if Buyers' representations about $34 billion of payments volume were true, Ontario's monetizable payments volume on the Valuation Date would be $43,393,573,125.[554] SwervePay would have converted 50% of that payments volume to payments facilitated through its platform.[555] That is $21,696,786,563.

---

Beach Opening Rep. ¶ 158. A July 2019 New Mountain presentation stated that comparable healthcare technology companies trade at approximately 17x and payments companies trade at approximately 20x. JX-236 at 9; *see* Beach Opening Rep. ¶ 159. A February 2020 New Mountain presentation informed Ontario's board that companies comparable to Legacy SwervePay trade at 20x. JX-791 at 5; *see* Beach Opening Rep. ¶ 162.

[549] JX-576.

[550] *Id.*

[551] *Id.* at 4.

[552] *Id.*

[553] *Id.*

[554] $34 billion × (1+.05)$^5$. *See supra* § II.E.2.b.i(a).

[555] *Id.*

Multiplying the payments volume SwervePay would have converted by the EBITDA contribution rate of 0.61% equals $132,350,398. Converting that figure to annual 2024 EBITDA using the LTM Adjustment yields $119,799,929.[556] Adding Standalone EBITDA of $29.7 million yields Combined EBITDA of $149,499,929. Applying a 20x multiple yields an enterprise value of $2,989,998,585.[557]

### iii. Equity Value And *Pro Rata* Calculation

To derive equity value, the court must first deduct net debt from enterprise value and add in cash from the exercise of incentive unit options.[558] Beach used $129.3 million as net debt based on the parties' pre-Acquisition expectations.[559] Buyers do not meaningfully dispute this figure.[560]

The per-unit damages price is a function of a numerator (the equity value) and denominator (total outstanding units). The total number of exercised options and PIUs affects both the numerator and the denominator. Beach included these figures in Exhibit 3 to his report. It reflects 3,229,850 outstanding units and 807,903 options or PIUs as of the Valuation Date.[561] Beach assumed that all outstanding options and

---

[556] *See id.* § II.E.2.b.i(b).

[557] The court's underlying calculations are not rounded.

[558] Damodaran, *supra* note 509, at 440.

[559] Beach Opening Rep. ¶ 179; JX-632 at 6.

[560] Austin uses net debt of $243.5 million based on a March 31, 2024 investment memo. Austin Rebuttal Rep. ¶ 82 n.113. It would lower damages in the court's adjusted model by nearly $3 million. The $243.5 million figure, however, is buried in a footnote in Austin's expert report and not addressed anywhere in briefing. *Id.* The court thus declines to adopt it.

[561] Beach Opening Rep., Ex. 3.

PIUs would be exercised, although that was far from given. This approach, however, has the overall effect of lowering Sellers' total damages. So this court accepts Sellers' approach, with one adjustment. The court has already found that Sellers' PIUs would not vest, so the court backs that number out of both the numerator and the denominator price when computing damages to Sellers for the Rollover Units.[562]

The table below shows the work described above.

---

[562] Hamilton and Jaeme's 14,500 PIUs are removed from the denominator. The proceeds from those PIUs, $2,030,000, are removed from the numerator. *See* JX-1045 at 8, 18 (showing their number of PIUs and their respective exercise prices).

| | Beach Model Low[563] | Beach Model High[564] | Adjustments |
|---|---|---|---|
| 2019 Monetizable Payments Volume | 34,000,000,000 | 34,000,000,000 | 34,000,000,000 |
| Growth Rate | 8% | 8% | 5% |
| 2024 Monetizable Payments Volume[565] | 49,957,154,611 | 49,957,154,611 | 43,393,573,125 |
| Conversion Rate | 50% | 80% | 50% |
| 2024 Converted Volume[566] | 24,978,577,306 | 39,965,723,689 | 21,696,786,563 |
| EBITDA Contribution Rate | 0.67% | 1.00% | 0.61% |
| Incremental SwervePay EBITDA[567] | 167,356,468 | 399,657,237 | 132,350,398 |
| LTM Adjustment[568] | 151,486,458 | 361,758,706 | 119,799,929 |
| Standalone Ontario EBITDA | 76,600,000 | 76,600,000 | 29,700,000 |
| Combined SwervePay/Ontario EBITDA[569] | 228,086,458 | 438,358,706 | 149,499,929 |
| Exit Multiple | 18 | 20 | 20 |
| Enterprise Value[570] | 4,105,556,245 | 8,767,174,116 | 2,989,998,585 |
| Net Debt | 129,300,000 | 129,300,000 | 129,300,000 |
| Cash from Exercise of Options and PIUs | 186,010,900 | 186,010,900 | 183,980,900 |
| Total Equity Value[571] | 4,162,267,145 | 8,823,885,016 | 3,044,679,485 |
| Total Units | 4,036,943 | 4,036,943 | 4,022,443 |
| Unit Price | 1,031 | 2,186 | 757 |
| *Equity Earnout* | *$103,104,432* | *$218,578,390* | *$75,692,297* |
| *Rollover Units* | *$931,044* | *$2,085,784* | *$656,923* |

### 3.    Prejudgment Interest

"In Delaware, prejudgment interest is awarded as a matter of right and computed from the day payment is due."[572]  This court has the discretion to set the interest rate and compounding interval.[573]

Buyers argue for zero prejudgment interest. Under Delaware law, when parties agree to "contractually express[] an interest rate, the Court will abide by that expressed interest rate."[574] Buyers contend that the parties contractually agreed to an interest rate of zero. They base this argument on Section 2.10(e) of the Purchase Agreement, which states that "no interest is payable with respect to any Earnout Payment."[575] This language would control if Sellers claimed breach of contract. But this language does not inform whether a party can recover prejudgment interest in

---

[563] Beach Opening Rep. ¶¶ 164–82; *id.* ¶ 179, table 13 (showing an expected value of the Equity Earnout of $103.1 million at an 8% growth rate, 50% conversion rate, and 18x EV/EBITDA multiple).

[564] *Id.*; *see also id.* ¶ 179, table 13 (showing an expected value of the Equity Earnout of $218.6 million at an 8% growth rate, 80% conversion rate, and 20x EV/EBITDA multiple).

[565] 2019 Monetizable Payments Volume $\times$ (1 + Growth Rate)$^5$.

[566] 2024 Monetizable Payments Volume $\times$ Conversion Rate.

[567] 2024 Converted Volume $\times$ EBITDA Contribution Rate.

[568] LTM EBITDA = Monthly EBITDA Increment $\times$ Average Month Placement $\times$ Number of Months, or [Incremental SwervePay EBITDA/(12x58)]$\times$[(47+58)/2]$\times$(58−47+1). *See supra* § II.E.2.b.i(b). This formula is reorganized for clarity. *See* Beach Opening Rep. at 79 n.281.

[569] LTM Adjustment + Standalone Ontario EBITDA.

[570] Combined SwervePay/Ontario EBITDA $\times$ Exit Multiple.

[571] Enterprise Value – Net Debt + Cash from Exercise of Options and PIUs.

[572] *Ct. Square*, 2024 WL 1655418, at *2.

[573] *See id.*, 2024 WL 1655418, at *1, *5 n.39.

[574] *See Parexel Int'l (IRL) Ltd. v. Xynomic Pharm., Inc.*, 2021 WL 3074343, at *19 (Del. Super. Ct. July 21, 2021).

[575] Purchase Agreement § 2.10(e)(ii).

the event of fraud. It therefore does not overcome Sellers' presumptive right to prejudgment interest under Delaware law.

Payment was due on the Cash Earnout 40 days from delivery of the revised Earnout Statement, which was August 17, 2022.[576] Beach's methodology for calculating the equity-based damages assumed an exit date of December 31, 2024. Payment was "due" on the equity-based damages as of December 31, 2024. Prejudgment interest will therefore be computed as of August 17, 2022, for damages on the Cash Earnout, and as of December 31, 2024, on the equity-based damages. Consistent with the practice of this court, prejudgment interest will be at the statutory rate,[577] compounded quarterly.

## III. CONCLUSION

Sellers have proven the Fraud Claims against Buyers. Judgment on Counts I through V is entered for Sellers. The court awards Sellers damages in the amounts of $43,750,000 for the Cash Earnout, $75,692,297 for the Equity Earnout, and $656,923 for the Rollover Units. Sellers are entitled to prejudgment interest,

---

[576] Sellers received the revised Earnout Statement on July 8, 2022. *See* JX-1676. Sellers had thirty days under the Purchase Agreement to object to the revised Earnout Statement, but they failed to do so. *See* Purchase Agreement § 2.10(d). That meant the Earnout Statement became final 30 days following Sellers' receipt of the revised Earnout Statement, August 7, 2022. *See id.* Ten days after, August 17, 2022, Sellers were entitled to payment of any accrued Earnouts. *See* Purchase Agreement § 2.10(a) (requiring payment of the Earnouts within ten business days following the Earnout Determination Date); *id.* at 9 "Earnout Determination Date" (defining the term as the date on which the Earnout Statement becomes final and binding under § 2.10(d)); *id.* § 2.10(d) (entitling Legacy SwervePay to 30 days to review the Earnout Statement and lodge an objection).

[577] 6 *Del. C.* § 2301; *see generally Ct. Square*, 2024 WL 1655418.

compounded quarterly. For the damages on the Cash Earnout, prejudgment interest will accrue from August 17, 2022. For damages on the Equity Earnout and Rollover Units, prejudgment interest will accrue from December 31, 2024. Sellers are entitled to post-judgment interest.[578] The parties are ordered to submit a form of order or competing forms of order implementing this decision and the *Laches Decision* within twenty business days. Sellers' request for attorneys' fees is denied.[579]

---

[578] 6 *Del. C.* § 2301(a); *see also NGL Energy P'rs LP v. LCT Capital, LLC*, 319 A.3d 335, 337 (Del. 2024) (holding that prejudgment interest is included in the "judgment upon which post-judgment interest is to accrue").

[579] Sellers request attorneys' fees on two grounds. First, they argue that they are entitled to attorneys' fees under the Limited Partnership Agreement's prevailing-party provision. Sellers' Post-Trial Opening Br. at 81; Limited Partnership Agreement § 16.14. But Sellers never asserted claims under the Limited Partnership Agreement; thus, fee-shifting on that basis is not warranted. Second, Sellers argue that they are entitled to fees and costs incurred while defending against Buyers' allegations, which they describe as frivolous. Sellers' Post-Trial Opening Br. at 81–82. Although this litigation was contentious, Buyers' allegations were not frivolous. *Horsey v. Horsey & Sons, Inc.*, 2016 WL 1274021, at *1 (Del. Ch. Mar. 21, 2016) (explaining that courts will shift "fees only where bad faith is manifest, as where the litigation appears clearly vexatious or without a good-faith belief").